THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* EARL HINES, Defendant-Appellant.

(No. 60539;

First District (1st Division)—August 4, 1975.

James J. Doherty, Public Defender, of Chicago (Phillip A. Olson and James M. Sammons, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Patrick T. Driscoll, Jr., and Michael J. Angarola, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE EGAN delivered the opinion of the court:

The defendant was indicted for the murder of Dale Mitchell; a jury found him guilty of voluntary manslaughter and he was sentenced to a term of 6 to 18 years.

On July 3, 1973, the deceased, Dale Mitchell, left his wife about 10:30 p.m. after an evening of drinking. His wife, from whom he was separated, was staying at her mother's home at 7215 South Princeton in Chicago. Mitchell lived at 7410 South Emerald. Mitchell arrived at the third-floor apartment of the defendant at 7220 South Harvard shortly after 10:30 that night. The defendant and his wife both knew Mitchell. Present in the apartment at the time of Mitchell's arrival were the defendant, his wife, his two sleeping children, and a neighbor woman with her three children. When Mitchell entered the apartment, the defendant, who was seated on a sofa, jumped up and said to Mitchell, "Dale, didn't I

tell you to stay away from here, what do you want?" The defendant's wife testified that she asked Mitchell what he wanted and he replied, "I came to get my woman." The defendant then told Mitchell to leave and walked toward him. The defendant's wife testified that Mitchell went to reach in his pocket and a fight began. The deceased was considerably larger than the defendant. According to the testimony of the defendant, his wife, and the neighbor, Sandra Freelon, Mitchell choked the defendant and struck him in the stomach and on the head.

When the struggle began, the defendant's wife went to call the police and while in the bedroom took a gun from under the bed and went out to where her husband and Mitchell were fighting. She went to hand the gun to her husband but she was afraid Mitchell might take it. She wanted to shoot Mitchell herself but she was afraid she might shoot her husband.

The defendant and his wife both testified that he broke loose from Mitchell after about 5 or 6 minutes and ran out the front door of the apartment. The defendant went into the hallway outside the apartment front door and then ran back into the apartment after Mitchell had run past him in the hall. Once back in the apartment, the defendant grabbed the gun from his wife's hand and ran down the stairs to the street.

Rose Vazquez testified for the State that she lived immediately below the defendant's apartment; that after she heard a scuffle upstairs in the late evening hours of July 3, she saw Mitchell leaving the building; he stopped momentarily at the front gate and spoke to Mr. Lewis, the landlord of the building, who occupied the first floor apartment; Mitchell completed his conversation with Lewis and walked north toward 72nd Street; the defendant came out of the front gate walking fast in the direction of Mitchell; the defendant said something to Mitchell but she did not know what he said; Mitchell turned around and faced the defendant; the two men were 2 or 3 feet apart at that time; Mitchell threw his hands in the air even with his head and held them in that position for "a moment or so, a second"; Mitchell turned and ran north away from the defendant; she lost sight of Mitchell but saw "fire coming from [the defendant's] hand"; it sounded to her as if there were five or six shots fired.

Mitchell's body was found about 5:30 the following morning slumped over a log in a litter cluttered yard at 342 West 72nd Street. His open wallet was found on the ground behind his body, and no gun was found. The cause of death was a gunshot wound in the back. It was stipulated that the pellet recovered from the deceased's back was fired from the defendant's gun, which had three expended shell casings in the cylinder when turned over to the police.

The defendant contends that the court erred in excluding evidence of the general reputation of the deceased and of previous altercations between the deceased and the defendant; and in refusing to instruct the jury on self-defense. All three assigned errors may be disposed of by answering one question: Was there any evidence in the record, regardless of its source, which, if believed by the jury, would support a finding that the defendant reasonably believed that the force he exerted was "necessary to prevent imminent death or great bodily harm to himself"? Ill. Rev. Stat. 1971, ch. 38, par. 7—1; *People v. Allen*, 50 Ill.2d 280, 278 N.E.2d 762.

The only evidence of what took place at the time of the actual shooting was provided by the testimony of Mrs. Vazquez, the defendant's testimony and the defendant's statement. The defendant correctly argues that for the purpose of resolving the crucial question, we may disregard the inculpatory testimony of Mrs. Vazquez although she contradicts the defendant's version. That being so, we must look to the defendant's testimony or his statement to determine whether or not there is any evidence that would support a finding of self-defense at the time of the shooting.

In the statement given later that night to the police, the defendant said that he told Mitchell to leave but he refused; his wife was trying to get to the phone and Mitchell said, "If you move, I'll kill you" and "reached for his pocket"; that Mitchell swung at him and hit him on the sides and they "got to tussling"; Mitchell left and the defendant grabbed the gun from his wife and went outside and fired three shots at Mitchell. When asked if he was pointing the gun at Mitchell at the time the shot was fired, he said:

"A. Well, I pointed it at him for him to stop and turn around, you know, and he did something, he waved his hand back or something and I fired three times. I fired the first shot as he went around the corner, and then one through the gangway at him as I was across from him—by the fire escape, he wasn't in the gangway.

Q. Did you ever see him with a gun last night?

A. No, sir.

Q. Did he ever try to shoot you at all?

A. No, he always told me he's going to get a contract on me and get me and my wife someway.

Q. The last time, did he come out with anything?

A. No, he reached for his pocket and then swung at me and hit me."

The defendant testified that he went out of his apartment after the deceased and shouted, "Hey motherfucker, didn't I tell you to leave me

and my wife alone." At the time the deceased was 30 to 40 feet away. The record then discloses the following:

"Q. After you said that to him, did he stop or did he continue?

A. He turned around, and it looked like he went to make a movement toward his pocket.

\* \* \*

A. His hand went down toward his pocket.

Q. Did they ever go up in the air?

A. They looked like they were coming down when I seen them, at the time I seen them.

Q. At the time what did you do?

A. I fired a couple of shots to scare him away.

Q. Were you firing at him when you shot at him?

A. Yes, I fired toward him to scare him away.

Q. Did he run when you fired?

A. He ran.

Q. How many shots did you fire?

A. I fired about three shots.

Q. Did you fire them in his direction?

A. In his direction."

On cross-examination he testified that Mitchell went past him in the hall and was moving fast going down the stairs. He also testified that he got the gun and then ran down the stairs after Mitchell. The record discloses the following:

"Q. All right, when he stopped, that was right after you yelled something, right?

A. Yes.

Q. Now, when he stopped, he turned around?

A. He turned around.

Q. And you came at him and at that time you had a gun in your hand, right?

A. At the time.

Q. Was the gun loaded?

A. It was loaded.

Q. Where were his hands at that time?

A. It looked like they were coming down.

\* \* \*

Q. And you called to him, but you didn't go up to him, you just stopped?

A. I just stopped.

Q. When he turned around, was he facing you?

A. He was facing me.

300

Q. For how long a period of time was he facing you?
A. Oh, maybe a second or so.
Q. And after that second, he turned and ran, didn't he?
A. He turned and ran.
Q. Did he run?
A. Yes.
Q. Did he run away from you or toward you?
A. He ran away from me.
Q. When he ran away from you, what did you do?
A. Well, before I fired a couple of shots, I fired three shots.
Q. Sir?
A. I fired three shots.
Q. After he turned and ran away from you?
A. Yes."

On redirect he testified as follows:

"Q. Mr. Hines, you testified that you shouted to the deceased, is that correct?
A. Yes, I did.
Q. He stopped, is that correct?
A. Yes.
Q. And he turned around?
A. He turned around.
Q. You testified that his one hand was up in this location. (Indicating.)
A. Right:

＊　　＊　　＊

Q. Did he ever move his hand from that position?
A. Yes, he did.
Q. Where did the hand go?
A. They went toward his pocket.
Q. When did you first fire your first shot?
A. I fired my first shot, as I fired my first shot, he turned around, I guess he heard the shot and he turned around.
Q. And the second two shots?
A. Were fired toward him.
Q. After he was turned around?
A. After he was turned around."

■■ It is conceded that initially Mitchell was the aggressor. The defendant's statement or his testimony or a combination of both establish that he armed himself with a gun after his assailant had already left; he chased after Mitchell and called to him to attract his attention. Mitchell, although previously the aggressor, had declined further struggle. The linchpin of the defendant's argument is his testimony that Mitchell's

hand went down toward his pocket. (In his statement he said Mitchell "did something, he waved his hand back or something and I fired three times.") But when Mitchell turned he saw the defendant, a man in a belligerent mood pointing a gun at him. At that point it was the defendant who was the aggressor. As a general rule, the person who is the aggressor or provoked the difficulty in which he killed his assailant cannot invoke the right of self-defense to justify the homicide. *People v. Tillman*, 383 Ill. 560, 50 N.E.2d 751; *People v. Martellaro*, 281 Ill. 300, 117 N.E. 1052.

■■ The defendant did not testify, as he could have, that he was in fear of losing his life or suffering great bodily harm at the time he fired the shots. (*People v. Harris*, 8 Ill.2d 431 436, 134 N.E.2d 315; *People v. Dixon*, 10 Ill.App.3d 1038, 1043, 295 N.E.2d 556.) His only testimony concerning his state of mind was that he fired the shots to "scare" Mitchell, who never displayed a gun and never said he had one. There was no evidence that he possessed anything that resembled a gun. And the defendant cannot explain away the so damaging fact that Mitchell was shot in the back while running away. The right of self-defense does not justify an act of retaliation and revenge. (*People v. Thornton*, 26 Ill.2d 218, 186 N.E.2d 239; *People v. Dillon*, 24 Ill.2d 122, 180 N.E.2d 503.) Nor does it justify the pursuit of the original aggressor who has abandoned the quarrel. The observation made by the court in *People v. Jersky*, 377 Ill. 261, 269, 36 N.E.2d 347, quoted in *People v. Maurantonio*, 8 Ill.2d 60, 64, 132 N.E.2d 515, is most appropriate:

> "'It is probably true that the deceased provoked the original altercation, but that does not help the defendant any because pursuit and killing after the deceased had abandoned the quarrel could not be self-defense.'"

In our view, the evidence was insufficient to support a finding of self-defense under all the circumstances. We judge, therefore, that the trial court properly excluded the proffered evidence and properly refused to submit a self-defense instruction to the jury. See *People v. Dukes*, 19 Ill. 2d 532, 539-40, 169 N.E.2d 84.

The defendant also contends that the trial court erred in refusing to submit the question of involuntary manslaughter to the jury.

A person commits involuntary manslaughter when he "kills an individual without lawful justification \* \* \* if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly." (Ill. Rev. Stat. 1973, ch. 38, par. 9—3(a).) The Criminal Code defines recklessness (Ill. Rev. Stat. 1973, ch. 38, par. 4—6):

> "A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist

or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation."

■■ The question is whether there is evidence which could support a jury's finding of recklessness within the meaning of the statute and that such defendant's recklessness caused the death of Mitchell. We believe that there is and that a verdict for involuntary manslaughter should have been submitted to the jury after appropriate instructions. The jury could have believed that the defendant did not intend to shoot Mitchell but only to "scare" him. It has been held that pointing a loaded pistol at another is such a gross deviation from the standard of care which a reasonable person would exercise that it constitutes recklessness. (*People v. Rodgers*, 2 Ill.App.3d 507, 276 N.E.2d 504.) Surely, then, the firing of a pistol at an individual in an attempt to "scare" him is also recklessness.

■ In his prayer for relief the plaintiff asks in the alternative that this court reduce the degree of the offense from voluntary manslaughter to involuntary manslaughter. The defendant's own testimony establishes his guilt of at least involuntary manslaughter; and no purpose will be served by a retrial on that charge. Therefore, we exercise the power granted this court under Supreme Court Rule 615(b)(3) (Ill. Rev. Stat. 1973, ch. 110A, par. 615(b)(3)) and reduce the degree of the offense for which the defendant was convicted from voluntary manslaughter to involuntary manslaughter. See *People v. Bembroy*, 4 Ill.App.3d 522, 527, 281 N.E.2d 389.

■■ The defendant also contends that the sentence of 6 to 18 years was excessive. In view of the fact that the sentence imposed exceeds the statutory maximum authorized for the offense of involuntary manslaughter, it is necessary to reduce the sentence. The defendant was the oldest of five children, had graduated from high school, and was honorably discharged from the army where he served for 2 years. He was steadily employed and was the father of two children, seven and four. He had no previous convictions. He was in his own home when attacked, a circumstance to be considered, not in condonation of his subsequent act, but surely in mitigation. We therefore fix his penalty at a minimum of 1 and a maximum of 6 years.

The judgment of the trial court is therefore modified to adjudge the defendant guilty of involuntary manslaughter and his sentence is fixed at a minimum of 1 year and a maximum of 6 years.

Judgment affirmed as modified.

BURKE, P. J., and SIMON, J., concur.