THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CHRIST BAUMAN, Defendant-Appellant.

(No. 61376;

First District (1st Division)—December 5, 1975.

Paul Bradley and Allen L. Wiederer, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Michael E. Shabat, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE BURKE delivered the opinion of the court:

Christ Bauman was indicted for murder in violation of section 9—1 of the Criminal Code. (Ill. Rev. Stat. 1973, ch. 38, par. 9—1.) Defendant was found guilty at a bench trial and sentenced to a term of not less than 14 years and not more than 14 years and one day. Defendant contends on appeal: (1) that the trial court erred in allowing the testimony of a witness who had been in the courtroom during the testimony of other witnesses in violation of the court's order excluding witnesses; and (2) that the evidence did not establish guilt of murder beyond a reasonable doubt.

On April 15, 1973, a party was held at the home of William and Judy Palmer to celebrate the christening of the son of James and Mary Bauman. The Palmer apartment is located at 3645 South Hamilton in Chicago. James Bauman is defendant's brother. Judy Palmer is Mary Bauman's sister. Also present at the party was Joan Marasovich, who is Mary Bauman's sister. Joan Marasovich was having an affair with James Bauman, Mary's husband. Defendant attended the party with his fiancee, Kathleen Pollard, whom defendant subsequently married. The record discloses that the celebrants were excessively drinking alcoholic beverages.

It was stipulated that a post-mortem examination disclosed that the body of William Palmer, the deceased, contained 282.0 milligrams percent alcohol. It was also stipulated that William Palmer died as a result of a bullet wound to his chest, and that the bullet removed from the deceased was fired from a .25-caliber automatic pistol.

Mary Bauman testified on behalf of the State. She began her account of the shooting incident by pointing to events which commenced at approximately 11:30 p.m. Mary Bauman saw the defendant beating and kicking his fiancee, Kathleen Pollard, in the yard of the Palmer apartment building. Mary Bauman, James Bauman and William Palmer proceeded to the yard and street area. James Bauman and William Palmer advanced towards the defendant despite defendant's pleas, "Stay away from me. Get away from me. Leave me alone." William Palmer attempted to calm defendant. Palmer and James Bauman backed defendant up against an automobile parked along the street. Mary Bauman saw the defendant fire one shot into the street pavement. She then saw defendant shoot William Palmer at an arm's length distance. Defendant allegedly fired another shot at his brother James.

During cross-examination, Mary Bauman testified that she purchased $75 worth of liquor and that the celebrants had been drinking during most of the day. She admitted that a fight broke out between herself and her sister, Joan Marasovich, in the apartment at approximately 10:30 p.m. However, Mary Bauman claimed that she could not remember the events surrounding the fight with her sister Joan. Mary Bauman stated that she believed that defendant yelled, "I am going to kill you." It was stipulated by the State and the defendant, however, that Mary Bauman did not inform the police in a written statement that defendant said, "I am going to kill you," at the scene of the shooting.

John Furmanek, a Chicago police officer, testified that he arrived at 3645 South Hamilton and found the deceased lying in the middle of the street. After Mary Bauman entered the squad car, Furmanek testified that when the defendant was arrested, he "was crying and a nervous wreck." Defendant's emotional instability intensified when informed that William Palmer was dead. Defendant led the police to a gangway between two garages where a .25-caliber automatic pistol was buried. Defendant stated, "Yes, I killed him. Look at what they did to me. They turned me into an animal." Defendant also told Furmanek that the shooting was an accident and that he did not intend to kill anybody. Another police officer found a shell casing on the street.

Kathleen (Pollard) Bauman testified on behalf of the defendant. Approximately an hour before the shooting, 10:30 p.m., Mary Bauman and her sister, Joan Marasovich, were physically fighting with each other on the floor of the apartment. Kathleen pulled Joan from the fight and took her out of the apartment. When Kathleen returned, she found that James "had Christ [the defendant] by the throat." William Palmer attempted to separate the two brothers. The defendant did not threaten or attack anyone. He departed for his home immediately. Kathleen did not accompany the defendant, her fiance, because she could not find her purse.

The defendant returned to pick up Kathleen approximately 30 minutes later but did not enter the Palmer apartment. Defendant told Kathleen that she was lying about her lost purse. An argument ensued which resulted in Kathleen being slapped to the ground. Kathleen testified that she was too intoxicated to regain her balance. Joan Marasovich screamed to the others that defendant was beating Kathleen. William Palmer and James Bauman hurried from the apartment, and immediately started to stalk the defendant. As defendant backed up, he said, "I don't want him [James] near me. Stay away from me." James was hollering, but William was speaking calmly. Defendant pulled a revolver and fired a shot into the street pavement. "Now stay away from me," he said, "I mean it.

Keep him away from me." Prior to the second shot which fatally wounded William Palmer, defendant raised his right hand and said, "Stay away from me. Don't touch me. Leave me alone."

Kathleen testified that Joan Marasovich was outside the apartment at the time of the shooting. However, Kathleen did not see Mary Bauman come out of the building until after the shooting occurred. Only two shots were fired. Kathleen did not hear defendant say, "I will kill you."

Defendant testified that he and William Palmer, the deceased, had been friends for approximately three years. The defendant also stated that he and his brother James were normally on good terms. However, James is inclined to violent behavior when he is intoxicated. Defendant is afraid of James when he is drinking because James is strong, muscular, and 25 pounds heavier than defendant.

Animosity between James and the defendant grew from the circumstances surrounding the fight between Joan and Mary. James wanted to "kick the so-and-so" out of Joan for starting the fight with his wife Mary. The defendant physically deterred James from attacking Joan. James then grabbed defendant by the throat and said, "I will kill you." In order to break away from James, defendant stuck his fingers in James' eye. After a struggle, defendant finally released himself from James and departed.

When defendant returned to pick up Kathleen, he "was not angry at anyone, but was mad over the events of the evening and how a party could turn into a brawling mess." Defendant was also upset because Kathleen lost her purse which forced him to return to the Palmer apartment. After the argument between Kathleen and the defendant, William Palmer came out of the apartment and attempted to calm the defendant. Palmer said, "Take it easy, Christ, relax. There isn't any need for all this." Christ Bauman, the defendant, replied, "Oh, I just want to get her and get out of here." James rushed to a point directly behind William Palmer hollering, "You, M.F.er." Defendant retreated to automobiles parked along the street and drew his revolver. Defendant's intent was to drive away from the scene in his automobile in order to avoid a fight with James. William Palmer walked directly in front of defendant and said, "Hey, take it easy, take it easy." Defendant replied, "I'm not shooting anybody. J just don't want him [James] near me. I don't want him around me." Palmer said, "Come on, take it easy. Calm down. Calm down." Defendant replied, "Damn it, I mean it. I don't want him near me. Keep him away from me." James crossed the street and moved next to a parked automobile in order to circle behind the defendant. Defendant fired a shot into the street pavement as a warning when James advanced towards him from behind a parked car. Defendant feared

James and attempted to keep him in sight at all times. Defendant then raised his arm and the revolver discharged accidentally. William Palmer stumbled a few steps and fell. Defendant turned to James and said, "My God, what have you made me do? What has happened? You have turned me into an animal."

Defendant stated that he did not intend to kill anybody, nor did he threaten to kill anybody on the night of the shooting. Only two shots were fired. After the second shot, defendant cried and "shook all over" in bewilderment. After burying the revolver in fear, defendant returned to the street and stopped the police squad car in order to surrender himself.

Joan Marasovich testified in rebuttal over defendant's objection. She attempted to intercede on Kathleen's behalf during the argument between Kathleen and defendant at approximately 11:30 p.m. outside the Palmer apartment building. Defendant allegedly pointed his revolver at her and said, "Joan, I like you. Do me a favor. Get away from me right now." While returning to the apartment, Joan said to William Palmer, "Let's both go in the house. He has got a gun."

On cross-examination, Joan stated that she did not speak with any police officers nor with any State's Attorney about the incident after the night of the shooting. She did, however, tell two State's Attorneys on the day of trial that defendant pointed a revolver at her. Joan Marasovich was inside the Palmer apartment at the time of the shooting.

John Olson, a Chicago police officer, was called in surrebuttal on behalf of the defendant. Olson spoke with Joan Marasovich at her home as part of his investigation of the homicide. Joan Marasovich did not inform Olson at that time that the defendant pointed a gun at her on the night of the shooting.

Kathleen Bauman took the stand for a second time in surrebuttal on behalf of the defendant. She stated that defendant never pointed a revolver at Joan Marasovich. Kathleen first saw the revolver when defendant drew it against the advancing Palmer and James Bauman.

Defendant first contends that the trial court erred in allowing Joan Marasovich to testify in rebuttal after she had been in the courtroom in violation of the court's order excluding witnesses. The State responds that no order excluding witnesses was entered by the trial court. Contrary to the State's argument, the record reflects that the State consented to defendant's motion to exclude witnesses. The trial court affirmed the motion.

■■ It is within the sound discretion of the trial court to allow a witness who has violated an exclusion order to testify in rebuttal. (*People v. Gibson*, 42 Ill.2d 519, 248 N.E.2d 108; *People v. Horne*, 110 Ill.App.2d

167, 249 N.E.2d 282.) The trial court's decision will not be disturbed unless a clear abuse or prejudice to the defendant is shown. (*People v. Chennault*, 24 Ill.2d 185, 181 N.E.2d 74; *People v. Nelson*, 33 Ill.2d 48, 210 N.E.2d 212.) In the instant case, Joan Marasovich informed the court that she was in the courtroom for only an hour before she was called to testify. Defense counsel was allowed to interview Marasovich before she testified in rebuttal. Marasovich's testimony was confined to the rebuttal of defendant's statement that he initially exhibited his revolver when he was attacked by James Bauman. Moreover, the defendant was able to discredit Marasovich's testimony through cross-examination and the surrebuttal testimony of Officer Olson and Kathleen Bauman. The trial court's decision cannot be held to be reversible error because the defendant was not prejudiced.

Defendant's second contention is that the evidence failed to prove guilt of murder beyond a reasonable doubt. Defendant seeks a reversal but contends in the alternative that a reduction in the degree of the offense from murder to the included offense of involuntary manslaughter would be appropriate.

Murder and the lesser included offense of involuntary manslaughter are distinguished only in terms of the mental state required. (See Ill. Ann, Stat. ch. 38, § 9—3, Committee Comments (Smith-Hurd 1972).) Murder is the killing of an individual without lawful justification where, in performing the acts which caused death, the person either intends to kill or do great bodily harm, or knows that such acts create a strong probability of death or great bodily harm. (Ill. Rev. Stat. 1971, ch. 38, par. 9—1.) Involuntary manslaughter is the killing of an individual without lawful justification where the acts, whether lawful or unlawful, which caused the death are such that are likely to cause death or great bodily harm to some individual and the acts are performed recklessly. Ill. Rev. Stat. 1971, ch. 38, par. 9—3.

Murder requires an intent to kill or do great bodily harm, or knowledge that the acts create a strong probability of such a result, while the conviction for involuntary manslaughter requires only reckless conduct which causes death. Reckless is defined in our Criminal Code as follows:

"4—6 RECKLESSNESS. A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." (Ill. Rev. Stat. 1971, ch. 38, par. 4—6.)

Involuntary manslaughter requires no felonious intent and the only mental state required is the conscious disregard of a substantial and unjustifiable risk. *People v. Bembroy,* 4 Ill.App.3d 522, 281 N.E.2d 389.

■■ In the case at bar, defendant stated that he did not intend to kill James Bauman or William Palmer. Violent behavior characterized the conduct of most of the celebrants at the christening party. Defendant was fearful and disgusted with the general tenor of the violence which was caused in part by the intoxicated condition of the participants. Approximately an hour prior to the shooting of William Palmer, defendant had to physically tear himself away from his brother, James Bauman, who had threatened to kill him. Defendant's fear culminated when James attempted to attack him in the street. Defendant pointed a revolver in the general direction of William Palmer and James Bauman. Defendant bore no ill will towards Palmer. The pointing of a loaded revolver at another is such a gross deviation from the standard of care which a reasonable person would exercise that it constitutes recklessness. (*People v. Bembroy,* 4 Ill.App.3d 522, 281 N.E.2d 389.) The evidence indicates that the fatal shooting of William Palmer stemmed from defendant's reckless behavior in attempting to prevent injury from being inflicted on him. Defendant's conduct constituted a conscious disregard of the substantial risk that his friend, William Palmer, would be killed.

■■ The defendant's testimony that the shooting was an accident is consistent with the statement he gave the police immediately after he was arrested shortly after the shooting. He was corroborated by his wife, whose interest is apparent, but whose testimony is not to be disregarded as a matter of law because of that interest. The crucial evidence against the defendant's version is the testimony of Mary Bauman, who testified, "I *believe* that I heard Chris yell, 'I am going to kill you.'" (Emphasis added.) That testimony is equivocal. Significantly, in her written statement she never told the police that the defendant said he was going to kill anybody. Moreover, Joan Marasovich was on the street at the time of the shooting but she did not testify that she heard defendant say, "I am going to kill you." Also, defendant's wife, Kathleen, testified that Mary Bauman was inside the Palmer apartment at the time of the shooting. Mary Bauman also admitted that she could not remember the fight she had with her sister, Joan Marasovich. Furthermore, Mary Bauman testified that the defendant was backing away from his brother and the deceased after telling them to get away from him and to leave him alone. While we recognize that the credibility of witnesses is to be determined by the trier of fact, we conclude that this evidence as a whole is insufficient to prove the defendant guilty of murder beyond a reasonable doubt.

590

██ The evidence, however, does prove defendant guilty of involuntary manslaughter beyond a reasonable doubt. Under the power granted by Supreme Court Rule 615(b)(3), we reduce the degree of the offense for which defendant was convicted from murder to involuntary manslaughter. (Ill. Rev. Stat. 1971, ch. 110A, par. 615(b)(3); *People v. Felton*, 12 Ill.App.3d 201, 298 N.E.2d 372 (abstract opinion).) Pursuant to Supreme Court Rule 615(b)(4), we reduce defendant's sentence of a term of not less than 3 years and not more than 10 years' imprisonment.

The judgment is therefore modified to adjudge the defendant guilty of involuntary manslaughter and to reduce his sentence to a term of not less than 3 years and not more than 10 years' imprisonment and is affirmed as modified.

Judgment affirmed as modified.

GOLDBERG and EGAN, JJ., concur.