THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EAMMY SMITH, Defendant-Appellant.
First District (6th Division)   No. 1—87—3113

Opinion filed June 30, 1989.

Randolph N. Stone, Public Defender, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago, for the People.

JUSTICE McNAMARA delivered the opinion of the court:

After a jury trial, defendant Eammy Smith, a minor, was found guilty of involuntary manslaughter and sentenced to probation until she reached the age of 21. Defendant appeals, contending that she was not proved guilty beyond a reasonable doubt; that improper comments were made during closing argument; and that the sentence imposed was improper.

On November 8, 1986, at 8:30 a.m., John Gaines was shot in the head by defendant in the apartment they shared along with their nine-month-old baby. After several days in a deep coma, decedent died. Mary Gaines, decedent's mother, testified for the State that on November 8 at 8 a.m. she spoke to her son on the telephone and he agreed to bring her some bacon. Forty-five minutes later, defendant telephoned Gaines, screaming that "they" had shot decedent. Gaines went to the apartment and found defendant "wild and hysterical."

Officer Linda Drozdek testified that when she arrived at the scene of the shooting, defendant was screaming, crying and hysterical. Defendant said she did not know the man who shot decedent and had never seen him before. Defendant gave a detailed description of the assailant. After shooting decedent, the assailant fled through the back door of the apartment. Drozdek sent the description over the police radio.

Drozdek observed decedent lying unconscious in a small foyer with a gunshot wound in the head. A bullet was lodged in the archway connecting the vestibule area with the living room. A gun was lying on the floor in front of the back door. The outer door and burglar gates were open.

Mitra Kalelkar, a forensic pathologist, testified that she performed an autopsy on decedent. The head showed a trajectory wound from front to back, with a slight angle upward.

Officer William O'Connor, an evidence technician, testified that he recovered a bullet from the wall in the apartment and the gun from the kitchen floor. The gun contained a discharged cartridge which was two cylinders down from the right of the hammer.

Officer Richard Fournier, a firearms examiner for the police de-

partment, testified that in order for a discharged cartridge casing to be in the second position to the right of the hammer, the trigger would have to be pulled twice. Such a cylinder could also be manually rotated. Fournier was unable to determine whether the recovered bullet came from the gun found in the kitchen.

Officer Krippel testified that at the scene he noticed a package of bacon on a table. He also saw the recovered gun, and in the second cylinder from the top, on the right-hand side of the gun looking down the sight, was an expended cartridge. On cross-examination Krippel testified that in his November 8 report, he said the expended cartridge was in the second chamber to the right. He testified that it was in the third chamber, but on redirect testified that looking down the sight of the gun, the expended cartridge was in the second chamber to the right of center.

At the hospital, Krippel attempted to interview defendant, but she was too emotional. She stated only that the offender was a male and that he fled after shooting decedent. Defendant agreed to accompany Krippel to the police station to attempt to identify the man. Defendant, accompanied by two of decedent's cousins, looked through photograph books and after a few minutes defendant picked out photographs of three men who looked like the assailant. At about 12:45 p.m., Krippel and Officer Bosco interviewed defendant for 25 minutes. Defendant provided the same description of the offender which she had given at the scene of the shooting. Defendant stated that she was in bed when she heard arguing and one gunshot. She ran into the foyer and saw decedent on the floor and a man running out the back door. Defendant denied keeping any weapon in the apartment and denied that she and decedent had any problems in their relationship.

After speaking with Tommy Williams, who sold newspapers outside defendant's apartment, the officers returned to interview defendant. They told defendant that her version of the events contradicted information they had from others. Defendant then stated that "she just wanted to get everything clear and that this whole matter was just something of self-defense." After being read her *Miranda* rights and told she could be tried as an adult, defendant stated that she shot decedent because he had often beaten her. The night before the shooting decedent had accused her of being involved with another man and hit her. The next morning, defendant again yelled at her and struck her several times. Defendant was "fed up," and she took out the gun. Defendant followed decedent into the vestibule area and cocked the gun. Decedent laughed and told defendant he would "kick her ass" for pulling a gun. She fired the gun once.

Defendant became scared, so she made up a story about an unknown assailant to avoid getting into trouble. She yelled for help out the window, ran to the security office, and opened the back door and burglar gates to support her story. She acted hysterical on the scene and at the hospital to further support her version of the events.

Officer Albert Wolf testified for defendant that he spoke with decedent's mother at the hospital. Gaines told him she spoke with decedent on the telephone that morning and she thought decedent and defendant were arguing.

Tommy Williams testified for defendant that he had heard decedent and defendant arguing several times, and defendant would say things such as, "[W]hy would you hit on me and beat me?" On November 8, 1986, Williams heard decedent hitting defendant, heard the arguing, and heard defendant asking decedent to stop hitting and whipping her. After a minute of silence, Williams thought he heard two shots. After another minute or two, defendant yelled out the window for help.

Defendant testified that when she was 15 years old, 18 months before the shooting, she met decedent and became pregnant. They lived together after that. Decedent often beat her. On November 8, 1986, when she got the gun, she did not check to see if it was loaded. She "put the hammer down." She stated, "I made a mistake to pull the hammer down." She heard the gun click. She tried to let the hammer back up, and when she did so, the gun fired. Defendant denied pulling the trigger. She pointed the gun in decedent's direction, but did not aim it at him. She pointed the cocked gun at the floor. She tried to uncock the gun, but it fired, striking decedent in the forehead. Decedent was about 10 inches taller than defendant. Defendant thought she told the police that she tried to cock the gun and it fired. Defendant had previously pulled the gun on decedent several times, attempting to stop him from hitting her.

Defendant admitted telling the police someone else had shot decedent and giving full descriptions of the offender. She denied being hysterical. She acknowledged identifying three men from photographs as possible assailants, although she had never before seen any of the men.

Catania Banks, Lauren Alexander and April Collie testified for defendant that decedent had beat defendant on previous occasions.

On September 18, 1987, the trial court sentenced defendant to probation until her 21st birthday, on December 27, 1990. At the time of sentencing, defendant was 17 years and 9 months old.

■■ ■ Defendant first contends that she was not proved guilty be-

yond a reasonable doubt of involuntary manslaughter. A conviction will not be reversed unless the evidence is so improbable, impossible, or unsatisfactory as to raise a reasonable doubt of defendant's guilt. (*People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233.) It is within the province of the trier of fact to determine the credibility of the witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence. *People v. Dunklin* (1982), 104 Ill. App. 3d 685, 432 N.E.2d 1323.

In order to prove involuntary manslaughter, the State must establish that defendant committed a lawful or unlawful act which caused the death of another, that the act was likely to cause death or great bodily harm, and that the act was performed recklessly. (Ill. Rev. Stat. 1987, ch. 38, par. 9—3(a).) Recklessness includes acting with a conscious disregard for a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard is a gross deviation from the standard of care which a reasonable person would exercise in the situation. (Ill. Rev. Stat. 1987, ch. 38, par. 4—6.) The only mental state required, therefore, is conscious disregard of a substantial and unjustifiable risk. (*People v. Bauman* (1975), 34 Ill. App. 3d 582, 340 N.E.2d 178.) It is for the trier of fact to determine whether the killing was the result of either an accident or reckless conduct. *People v. Schwartz* (1978), 64 Ill. App. 3d 989, 382 N.E.2d 59.

Defendant pointed a loaded gun at decedent, which indicates recklessness. (*People v. Schwartz* (1978), 64 Ill. App. 3d 989, 382 N.E.2d 59; *People v. Moczarney* (1978), 65 Ill. App. 3d 410, 382 N.E.2d 544.) Defendant confessed to quarreling with decedent, taking a gun from under the bed, following decedent into the vestibule, cocking the gun, and pointing it at him. Defendant admitted pushing the hammer down and hearing the gun click. She aimed the cocked gun at defendant and the gun fired. The bullet struck decedent, who was 10 inches taller than defendant, at an upward angle. This is sufficient to establish recklessness. See *People v. Schwartz* (1978), 64 Ill. App. 3d 989, 382 N.E.2d 59; *People v. Bembroy* (1972), 4 Ill. App. 3d 522, 281 N.E.2d 389.

Defendant maintains that the shooting was an accident, and not the result of a voluntary act. She contends that the gun only fired once, despite the testimony of O'Connor and Krippel that there was a discharged cartridge in the second chamber of the gun. Fournier testified that for a cartridge to be in this position it would be necessary to pull the trigger twice. Defendant relies on Fournier's testimony on cross-examination that a bullet could also get in the chamber by man-

ually rotating the cylinder on the gun. The jury could reasonably rely on Fournier's testimony that cocking and releasing is usually the cause of a rotation and conclude that the condition of the gun indicated the trigger was pulled twice, thus tending to show the shooting was not an accident.

Furthermore, the jury could give less weight to defendant's claim that she fired once by accident, after considering the overall credibility of defendant's testimony, including her admission that she rearranged physical things at the scene, such as the burglary gates and back door, to fit her first version of the event. The jury could also consider defendant's admitted series of lies to the police and performances of hysteria.

■ The evidence here was not so improbable, impossible, or unsatisfactory as to raise a reasonable doubt of the defendant's guilt. The evidence strongly supports the jury's finding that defendant was guilty of involuntary manslaughter.

Defendant next contends that she was denied a fair trial when the prosecutor made improper comments in closing arguments. In rebuttal closing argument, the prosecutor stated that defense counsel was asking the jury to "break the law" by attempting to engender sympathy for the 16-year-old girl and arguing that defendant "should not go to prison for stopping him from beating her," instead of urging a conviction strictly on the facts; told each juror that he did not "have to be a nuclear physicist to figure out what [defense counsel's] job is"; and told the jury that defendant was "evasive, not sure, coached" and "led through" by defense counsel. The prosecutor also stated that "if there is a witness out there, both parties have equal subpoena power. *** When they stand there and point the finger at us, anyone could walk up to the court's clerk and get a subpoena for any witness."

■ Defense counsel objected to each of these comments at trial, and each objection was sustained. The court also instructed the jury before, during and after the trial to disregard questions or answers which were struck or after which objections were sustained. In the context presented here, we find this was sufficient to cure any prejudice. (See *People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200; *People v. Sanchez* (1987), 163 Ill. App. 3d 186, 516 N.E.2d 556.) Moreover, many of the comments were invited by improper comments made by defense counsel during closing arguments. See *People v. Dixon* (1982), 91 Ill. 2d 346, 438 N.E.2d 180; *People v. Vriner* (1978), 74 Ill. 2d 329, 385 N.E.2d 671.

Defendant finally contends that the sentence was unlawful. The court placed her on probation until her 21st birthday on December 27,

1990, which was 39 months and 9 days after sentencing. Defendant points to sections 9—3(d) and 5—6—2(b)(2) of the Criminal Code of 1961 and the Unified Code of Corrections, respectively (Ill. Rev. Stat. 1987, ch. 38, pars. 9—3(d), 1005—6—2(b)(2)), under which the period of probation for the Class 3 felony of involuntary manslaughter cannot exceed 30 months. Defendant asks that the probation sentence be reduced to 30 months.

Defendant, a minor, was tried as an adult. After conducting a dispositional hearing under section 5—1 of the Juvenile Court Act (Ill. Rev. Stat. 1985, ch. 37, par. 705—1, the court was permitted to impose a sentence "of probation *** not [to] exceed 5 years or until the minor has attained the age of 21 years, whichever is less." (Ill. Rev. Stat. 1987, ch. 37, par. 705—3(1).) The court found defendant to be a delinquent minor, and found it was in defendant's and the public's best interests that defendant be made a ward of the court under the legal guardianship of her aunt. The court could properly sentence defendant to probation until the age of 21.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

EGAN, P.J., and LaPORTA, J., concur.