THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARIO LEE, Defendant-Appellant.

First District (5th Division)   No. 1—91—1154

Opinion filed November 19, 1993.—Rehearing denied December 22, 1993.

Daniel J. Stohr, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Donald T. Lyman, and Michael K. Goldberg, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNULTY delivered the opinion of the court:

Mario Lee was indicted for the offense of first-degree murder. After a bench trial by the circuit court of Cook County, Lee was convicted of the offense and was sentenced to 20 years' imprisonment. A timely notice of appeal was filed. Defendant requests that this court reduce the offense from murder to manslaughter per Supreme Court Rule 615(b)(2) (134 Ill. 2d R. 615(b)(2)).

In this appeal defendant makes four arguments: (1) the trial court improperly found sufficient evidence of the requisite mental state for first-degree murder rather than involuntary manslaughter; (2) the trial court improperly failed to take judicial notice of certain scientific principles involving ricochet evidence; (3) the trial judge's comments manifest the sort of confusion that entitle this court to disturb the findings of fact determined below; (4) the trial judge focused on an irrelevant consideration—whether or not defendant was "scared"; and (5) the State's failure to disclose defendant's alleged threat was reversible error.

The facts are as follows. Defendant was 21 at the time of the offense. He lived in a house with 13 brothers and sisters. Defendant and all of the eyewitnesses knew one another. Defendant testified that his car was broken into on a Friday night, four or five days before the offense. He testified that the stolen property included "my radio, speakers and like two hundred and fifty dollars." Defendant testified that on Monday evening, October 9, 1989, two days before the offense, he saw Eric Jackson on 46th and Lamon. He testified that Jackson was intoxicated. Defendant asked Jackson "about my trunk, him breaking into my trunk and then he kind of got upset." Defendant testified that Jackson hit him and bit him on his left hand. Jackson's testimony corroborated the fact that he had a fight with the defendant where the defendant accused Jackson of breaking into defendant's trunk and taking some of his property. According to Jackson's testimony, the fight occurred the day before the offense at around 11 o'clock in the evening of October 10, 1989. Jackson's friend Anthony Allison and defendant's brother Ronald Lee were present at the time. Jackson and defendant swung blows at each other. Allison and defendant's brother broke up the fight. Jackson testified that defendant then said "he was going to put a cap in my ass. Said he was going to get me."

On the day of the offense, October 11, a second áltercation occurred between defendant and Jackson on the same street corner. At around 12:30 p.m. defendant, with his left hand bandaged as a result of being bitten by Jackson, again approached Eric and "asked him again about my money. He [Eric] said he wasn't paying me s-h-i-t." Willie Ray, Wilfred Brock, Quenton McKenney, and defendant's nephew, who is also named Mario Lee, were present. Ray, Jackson and McKenney all identified defendant in court. Ray testified that defendant and Jackson were arguing over the fact that "Eric was supposed to have broken into [defendant's] trunk." Ray further testified that defendant told Jackson "he was going to pay for breaking into his trunk." According to Jackson's testimony, he and defendant started fistfighting again. Jackson testified that the fistfight lasted "for at least five to ten minutes." Defendant gave testimony describing the altercation as follows: "Me and him was going around and around like we was trying to swing but we was going around in circles ***. Then I started to walk off." Defendant testified that during this confrontation he had a gun with him in the back of his trousers. McKenney, Jackson, Ray and defendant's nephew all testified that when defendant left he said that when he returned the four men on the corner had better be gone. Defendant denied making that statement. Defendant and his nephew left the corner of 46th and Lamon together.

Ray, Brock, Jackson and McKenney remained standing on the corner. Defendant returned five minutes later in his nephew's car. The car pulled up from the alley. Defendant's nephew was driving. Defendant, reaching over his nephew from the passenger's seat, shot three or four times out of the car. Defendant's testimony was that he aimed the shots toward the ground to the left of the car. At least two of the bullets ricocheted off the ground about 10 feet away from the car. One of those bullets hit and killed the victim, Wilfred Brock. The parties stipulated that the victim was 120 feet away from the car in which defendant was riding. Defendant testified that when he fired the shots his intention was to scare Eric Jackson. He testified that he did not intend to kill Eric Jackson. Defendant testified that he and his nephew were in his nephew's car because they were going to visit his sister.

Ray testified that when the shots were fired the gun was pointed "more or less at the people." Similarly, Jackson testified that defendant "had the gun horizontal hanging over out the window aimed towards the crowd." The witness raised his right hand and extended it across to the left of his body in a horizontal manner with the elbow extended. McKenney testified that when defendant was shooting:

"He leaned over towards—*** like this, this way.

Defense Counsel: For the record pointing down towards the ground at an angle.

THE COURT: The record will so reflect."

In response to the question, "Could you see where the gun was pointed?" McKenney testified that the gun was pointed toward "the crowd we were standing in." In his statement to the police, defendant said, "I shot at the ground." He made this statement before a lawyer was hired and before the ballistics expert was hired. Defendant also demonstrated from the witness stand that he shot directly at the ground. Defendant testified that he knew that bullets can ricochet.

After the shooting the car sped off.

Defendant's testimony at trial was not entirely consistent with his previous statements. He testified that he did not tell his nephew to stop the car before he began to shoot. However, according to his statement to the State's Attorney, he did tell his nephew to stop the car before he began to shoot. Similarly, he testified at trial that he did not accuse the four men of stealing items out of his car. Yet, according to his statement to the State's Attorney, he did accuse the four men of stealing items out of his car. In addition, the following exchange between the prosecution and the defendant is one where the defendant's testimony invites disbelief:

"Q. Do you remember telling Eric he's going to pay for breaking into the trunk?

A. Because I asked him was he going to pay.

Q. My question is not, sir, whether you asked him. Do you remember telling him he's going to pay for breaking into your trunk?

A. No."

Defendant first contends that the court erred when it found there was sufficient evidence of the requisite mental state for murder. The State and defendant agree that murder and the lesser included offense of involuntary manslaughter are distinguished only in terms of the mental state required. (*People v. Bauman* (1975), 34 Ill. App. 3d 582, 588, 340 N.E.2d 178, 182.) Defendant argues that defendant's mental state at the time he fired the shots was one which proves involuntary manslaughter as opposed to murder. It is the State's position that the court properly convicted defendant of first-degree murder.

Murder is defined as follows:

"A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death;

(1) he either intends to kill or do great bodily harm to that indi-

vidual or another, or knows that such acts will cause death to that individual or another; or

(2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another;

(3) *** [felony murder; omitted]." 720 ILCS 5/9—1(a) (West 1992).

Involuntary manslaughter is defined in this way:

"A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly *** [vehicular reckless homicide, omitted]." (720 ILCS 5/9—3(a) (West 1992).)

While the state of mind for murder is knowledge, the state of mind for involuntary manslaughter is recklessness, which is defined as follows:

"Recklessness. A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." 720 ILCS 5/4—6 (West 1992).

The judge, at the close of evidence, found that defendant shot and killed Wilfred Brock with the intention of creating a strong probability of his death or the death of another. Our role in reviewing the trial court's finding on this question of fact is limited. The standards governing our review are familiar: "A criminal conviction will not be set aside [on review] unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267; *People v. Williams* (1982), 93 Ill. 2d 309, 444 N.E.2d 136; *People v. Vriner* (1978), 74 Ill. 2d 329, 385 N.E.2d 671.) It is not our function to retry a defendant when considering a challenge to the sufficiency of the evidence of his guilt. (*Collins*, 106 Ill. 2d at 261.) Rather, determinations of the credibility of witnesses, the weight to be given to their testimony, and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact. (*People v. Brisbon* (1985), 106 Ill. 2d 342, 360, 478 N.E.2d 402.) On review, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *** [O]nce a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evi-*

*dence* is to be considered in the light most favorable to the prosecution.' " (Emphasis in original.) *Collins*, 106 Ill. 2d at 261, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; *People v. Strickland* (1992), 154 Ill. 2d 489, 609 N.E.2d 1366.

Intent may be inferred from the character of the act. (*People v. Davis* (1966), 35 Ill. 2d 55, 219 N.E.2d 468.) It is not necessary to directly prove that defendant had the intent to murder; all that needs to be shown is that defendant voluntarily and willfully committed an act, the natural tendency of which was to cause death or great bodily harm. (*People v. Steffens* (1985), 131 Ill. App. 3d 141, 148, 475 N.E.2d 606.) For example, in affirming the murder conviction in *People v. Cannon* (1971), 49 Ill. 2d 162, 273 N.E.2d 829, the "court observed that the defendant 'intended to fire the gun and did in fact point it and shoot in the decedents' general direction. This act, done voluntarily and wilfully, is sufficient evidence of the intent requisite to constitute the offense of murder.' " (*People v. Bartall* (1983), 98 Ill. 2d 294, 307, 456 N.E.2d 59, quoting *Cannon*, 49 Ill. 2d at 166.) Where the evidence is conflicting, it is for the trier of fact to determine whether a homicide is murder or manslaughter. *People v. Cowen* (1979), 68 Ill. App. 3d 437, 442, 386 N.E.2d 435.

■ In the present case we do not view the evidence as so unsatisfactory that no rational trier of fact could find the defendant guilty beyond a reasonable doubt. The State's evidence consisted of the testimony of the defendant, who conceded that it was he who fired the shot that killed the victim, and the testimony of three men present on the street corner who saw and heard the defendant shooting in their general direction. Their testimony revealed that prior to the offense the defendant threatened one of them three times. This evidence is sufficient to sustain the court's finding, notwithstanding the testimony of defendant that he did not intend to kill. Since the car never came to a complete stop (defendant testified that it "slowed"), and since defendant had to reach over his nephew, who was driving, in order to shoot out the driver's side window, it is a reasonable inference that the bullets ricocheted off the pavement by accident and not intentionally. The trial court specifically commented that it believed under the circumstances that the shots hit the pavement not because defendant was aiming towards the ground, but rather because defendant was a "lousy shot." The trial judge noted the consistency of the testimony of the State's witnesses as contrasted with the discrepancies between the defendant's testimony and the State's evidence as to the details. The trial court described the actions of defendant as "those of an aggressor *** a man who is going to make

other people pay for something that had occurred." The trial court found that defendant's testimony that he was scared at the time of the offense, while in a car 120 feet away from those he supposedly feared, and carrying a gun, undermined the credibility of his testimony as a whole. The trial court observed, "These are not the actions of a scared man." The court found that defendant "achieved his ultimate end *** to kill or do great bodily harm to one of these individuals."

Defendant's reliance on *People v. Bauman* (1975), 34 Ill. App. 3d 582, 340 N.E.2d 178, where the court reduced the murder conviction to involuntary manslaughter, is misplaced. There the evidence indicated that the fatal shooting stemmed from defendant's reckless behavior in attempting to prevent injury from being inflicted on him. (*Bauman*, 34 Ill. App. 3d at 589.) Defendant cites *People v. Kelly* (1975), 24 Ill. App. 3d 1018, 322 N.E.2d 527, arguing that if Kelly's offense was involuntary manslaughter, and not murder, then so too is that of defendant. *Kelly* is distinguishable. In that case the State's firearms expert testified that there were certain malfunctions in the weapon. The expert testified that he test-fired the gun for accuracy at eight feet and failed to hit the target, that because the rifling in the barrel was so poor the bullets came tumbling out of the barrel, and that with the gun aimed between a subject's eyes and discharged the bullet would not strike the subject or any part of his body. The defendant's testimony was that the purpose of squeezing the trigger was to fire a warning shot. Most importantly, there, the jury believed defendant's testimony that he did not intend to kill. Similarly, in *People v. Hines* (1975), 31 Ill. App. 3d 295, 334 N.E.2d 233, on which defendant also relies, the court stated that the jury could have believed that the defendant did not intend to shoot the victim but only to "scare" him.

■ We now turn to the question whether the trial court improperly failed to take judicial notice of certain scientific principles involving ricochet evidence. In his brief defendant cites a forensic treatise:

> "The path of a ricochet is unpredictable, although in the case of a ricochet on a body of water, the angle of incidence equals the angle of reflection. The missile penetrates the water for a short distance. The same may occur with a shot fired at a block of wood. In no other case can injury by ricochet be inflicted intentionally. These missiles are, therefore, of considerable legal significance." (Spitz & Fisher, Medicollegal Investigation of Death: Guidelines for the Application of Pathology to Crime Investigation 263 (2d ed. 1980).)

When a particular fact is not the subject of reasonable controversy and is relevant to the determination of the case, it is proper to apply the doctrine of judicial notice. Judicial notice may be taken of scientific principles and authoritative treatises that are generally known and accepted or "readily verifiable from sources of indisputable accuracy." (See *Murdy v. Edgar* (1984), 103 Ill. 2d 384, 394, 469 N.E.2d 1085.) Because we conclude that the "scientific principle" cited by defendant is not relevant to the determination of this case, we need not reach the question whether it is known or verifiable from accurate sources. The State's failure to take issue with the "scientific principle" below is not surprising because it did not harm the State's case. The trial court found defendant guilty of murder beyond a reasonable doubt because it felt defendant had the requisite intent for murder when he fired the shots from the car. The trier of fact discounted defendant's contention that he intentionally shot into the ground. Therefore, any "scientific principle" concerning intentionally trying to ricochet a bullet off the ground is immaterial to the court's finding.

■ We now consider whether the trial court's comments manifest the sort of confusion that would entitle this court to disturb the findings of fact determined below. Defendant argues that the trial court's way of framing the issue indicated that it incorrectly believed that the finding of murder necessarily followed from a finding of intent to shoot the gun. Defendant cites the trial court's comment that, "whether it was a knowing and intentional shooting or whether it was a reckless act is a question to be decided." Our painstaking review of the record leads us to conclude that the judge labored under no such misperception. The judge specifically found that the defendant "achieved his ultimate end *** and that was to kill or do great bodily harm to one of these individuals." Even when taken in artificial isolation this comment does not trouble us. It appears to us to be a shorthand way of describing an issue which cannot easily be fully explained in one sentence.

We must arrive at the same conclusion with regard to the trial court's statement that, "I believe *** that the Defendant had the reckless intent and knowledge as to what he was doing and what his acts would cause when he became involved in this type of activity." We feel that this statement, while inartful, does not manifest the confusion that would entitle this court to disturb the findings of fact determined below.

■ We next address whether the trial court improperly focused on an irrelevant consideration—whether or not defendant was "scared." Our review of the record discloses that the court did not

base its finding of intent to kill on whether the defendant was scared. Rather, it found that, given the facts and circumstances, defendant's testimony that he was scared was incredible. It is the province of the trier of fact to assess the credibility of witnesses. It is reasonable to assume that where part of a witness' testimony is unbelievable an unfavorable light is shed on that witness' credibility as a whole.

■ We finally address whether the State's failure to disclose defendant's alleged statement where he threatened "to put a cap in [Eric Jackson's] ass" was reversible error. Supreme Court Rule 412(a)(ii) provides that the State shall disclose "any written or recorded statements and the substance of any oral statements made by the accused or by a codefendant, and a list of witnesses to the making and acknowledgement of such statements." (134 Ill. 2d R. 412(a)(ii).) This case must be examined in order to determine whether the State's failure was harmless. (*People v. Weaver* (1982), 92 Ill. 2d 545, 442 N.E.2d 255.) The closer the evidence, the stronger is the case for excluding the statement or declaring a mistrial. (*Weaver*, 92 Ill. 2d at 560.) Here defendant was not prejudiced. The State's failure to disclose defendant's alleged statement did not affect the outcome of the proceeding. It is unlikely that prior notice could have helped the defense discredit the evidence. In addition, the other evidence of defendant's guilt remains overwhelming. Even if this alleged statement could have been discredited, three men testified that prior to the offense defendant threatened one of them on two separate occasions.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

GORDON, P.J., and MURRAY, J., concur.