In the
United States Court of Appeals
For the Seventh Circuit

No. 01-1653

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

SHARIF ALWAN,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 582--Ruben Castillo, Judge.

ARGUED October 24, 2001--DECIDED January 25, 2002


  Before HARLINGTON WOOD, Jr., COFFEY, and
EASTERBROOK, Circuit Judges.

  PER CURIAM.  Sharif Alwan was charged in
a one-count indictment with contempt of
court in violation of 18 U.S.C. sec.
401(3) for failing to testify before a
federal grand jury as ordered./1 He was
found guilty by a jury on October 20,
2000. On December 15, 2000, defendant's
post-trial motion for judgment of
acquittal or in the alternative for a new
trial was denied. Subsequently on March
7, 2001, the defendant was sentenced to
24 months imprisonment followed by 5
years supervised release, but no fines,
restitution or special assessments were
imposed. The defendant remains
incarcerated.

  Alleged trial errors on appeal involve
the admission of evidence, possible
exculpatory evidence not revealed by the
government, and sentencing errors, but
the result we reach does not require an
examination of all these issues.

I.  BACKGROUND

  Some of this factual background is not
contested by the defendant, but where it
is it will be indicated. The facts are
set forth in some detail so the case may
be better understood./2

  The defendant is a legal permanent

resident of the United States, who was born in Ramallah in the West Bank of Israel, commonly known as the Occupied Palestinian Territories. There the defendant was a friend and classmate of Rezeq Saleh. They often studied together. In 1989 the defendant emigrated to Chicago where his school friend, Rezeq Saleh, also came to live. In Chicago the defendant took classes at two local colleges but had no regular job. He did some odd jobs but said he was regularly supported by his brother.

In September 1992, the defendant flew back to the Middle East with Rezeq Saleh. Their tickets were purchased with one payment of $2,770.90 for travel via Amsterdam to Damascus, Syria, arriving in Damascus on September 28. The tickets provided for an open return not good after December 26, 1992. At trial the defendant explained that he went to attend his cousin's wedding in Jordan, but he could not remember whether or not he was accompanied on the trip by Rezeq Saleh.

Subsequently, in January 1993, a person named Muhammad Salah, a resident of the Chicago area who was arrested in Israel, gave several statements to Israeli authorities. He was a member of Hamas, which is identified as a political organization promoting violence to help establish an independent Palestinian homeland. In 1995, Salah's statements were provided to the FBI, and then to the United States district court in 1996 for use in the extradition proceeding of Mousa Abu Marzook (identified below). The Alwan/Saleh tickets and Middle East itinerary were obtained by the FBI in an effort to corroborate Salah's statements.

At about this same time in 1995, the defendant returned to the Middle East and while en route from Jordan to the West Bank was arrested by Israeli authorities. At this point the government's evidence and the defendant's story diverge. After he was arrested the defendant says that for two weeks the authorities tied him to a small, misshaped chair, covered his head with a dirty sack, shook him, and deprived him of sleep while being repeatedly questioned. As a result of that ordeal, he says he wrote out and signed a statement in Arabic. At trial he testified his statement was dictated to

him and was mostly false.

In his handwritten Arabic statement the defendant says he and Rezeq Saleh were recruited in Chicago by Hamas in 1990, given code names and then sent for training. First, he was sent for political training with Mousa Abu Marzook to Al-Amal Camp in Virginia. In his statement defendant wrote,

A number of lecturers attended the camp, including the head of the political committee, Najeeb Al-Ghosh, Abu Ahmad [AKA Muhammad Salah], and Muhammad Saleh. The conference was held over a weekend. Mousa Abu Marzook gave a speech concerning the political situation of the Gulf War, the status quo of the Occupied land, and the necessity of assisting the people in the Occupied Territories. I attended a camp that took place in Milwaukee. It was held on a weekend. I do not recall the exact date. Theoretical weapon training was conducted at this conference, or camp. The training on Klash (Kalishnikov or AK-47), M-16, and # 9 revolver was conducted. Later, theoretical training was given on how to deal with explosives, as far as assembling, types, and connecting, and how to booby-trap a car. Among those who attended this training were Rezeq Saleh, Muhammad Saleh, Abdul Hameed, as well as a Moroccan instructor, an instructor by the name of Khalid (LNU), and three other individuals, whose names I do not know because coded names were used. My code name at this session was Ahmad and Abdullah was the code name for Rezeq Saleh. This session lasted for approximately three days until the end of the week.

Government Exh. 11B. Defendant's statement was signed as Shariff [sic] Ahmad Muhammad Dehabra.

Then in 1992 more training followed when the defendant and Rezek Saleh were sent by Muhammad Salah and Muhammad Saleh from Chicago to Damascus, and later to Lebanon for additional weapons and explosives training. The defendant returned to this country at the end of February 1993, but two weeks later he received orders, he says, to freeze all Hamas activities and to contact no one. Muhammad Salah had been arrested in January 1993. Following his Israeli interrogation, the defendant

was charged with a lesser offense to which he pleaded guilty in return for a lighter sentence. He was released in June 1997 after serving a little less than two years. A month or so later the defendant got married and remained in the West Bank until June of the following year.

Upon his return to the United States, the defendant was subpoenaed to testify before the Special June 1997-2 Grand Jury investigating the criminal activity of Hamas in the Chicago area. The FBI had received allegations that the defendant was involved with Hamas. In July 1998, the defendant appeared before the grand jury, but after answering a few background questions he exercised his Fifth Amendment privilege. He specifically refused to answer any questions about allegations of money laundering between the Middle East and the United States. Later, after that grand jury appearance, the defendant returned to Ramallah in January 1999 to visit his family. He returned to this country in time to be subpoenaed again, this time before the Special January 1999-2 Grand Jury. The Chief United States District Judge, before whom the defendant appeared, granted the defendant immunity and then ordered him to testify. Represented by counsel, the defendant informed the district judge that he would not answer questions before the grand jury because the immunity he had been granted would not protect him on any return trip to Israel or Jordan.

The defendant then appeared before the special grand jury in July 1999, at which time an Assistant United States Attorney explained to him the district judge's order to testify. The defendant responded that even though he understood he had been granted immunity, that immunity would not protect him the next time he passed through Jordan to visit his family. He answered a few background questions, but then said he would answer no further questions because the immunity would not protect him from Israeli authorities whenever he again returned to the Middle East. He understood, he said, that the threat of persecution in Israel did not excuse him from testifying before the grand jury in Chicago, but he explained he was in a difficult position and would answer no further questions.

The defendant secured a new attorney who appeared before the district judge seeking the defendant's release from federal custody. His attorney explained that the defendant's refusal to testify was based on his genuine fear that should he return to the West Bank to visit his family, he would be persecuted. A different United States district judge temporarily became Acting Chief Judge. The government again served the defendant with a grand jury subpoena and secured another immunity order. The Acting Chief Judge warned the defendant, represented by his new attorney, that he could be prosecuted for criminal contempt if he failed to testify pursuant to the immunity order. Again, the defendant responded he had no choice and would not testify because of fear of persecution whenever he might return home in the Middle East. When the defendant later appeared before the grand jury that day, the Assistant United States Attorney again explained the immunity order and the possibility that the defendant might be prosecuted for contempt of court if he again refused to testify as ordered. It was further explained that the grand jury was investigating possible federal criminal violations involving Hamas. The defendant again declined to answer any questions, explaining that because of the risk of his possible persecution in the Middle East, he had no choice. Nevertheless, the Assistant United States Attorney propounded a series of questions to the defendant about his recruitment by Hamas, his relationship with Muhammad Salah, and the military training he received both in the United States and in Lebanon and Syria at the direction of Muhammad Salah and Abu Marzook. The Assistant United States Attorney also inquired about the defendant's travel to Damascus with Rezeq Saleh when he used the tickets purchased by Muhammad Salah. The defendant's responses were polite, positive, and clear. He would answer no questions.

As promised by the district court, defendant's contempt trial followed. The defendant testified at trial explaining he refused to testify before the grand jury because of his fear for himself and his family should he testify that his Israeli confession was false and if he further told of the threats against him. He said also that he was concerned that

the Shin Bet, Israeli security forces, would arrest and torture his family. He further explained that if he had been assured by this government that his testimony before the grand jury would not get back to the Israelis, and further, if his family had been offered the protection of this government, he would have answered the questions, or "might have." The defendant conceded, however, that he had not asked the court or this government for any protection. He also related that during his incarceration in Israel he had complained about his treatment to both the Israeli Ministry of Justice and the Red Cross, but no harm had resulted to his family from those complaints. In addition, after his release and while living in the West Bank, he testified there were no related incidents. Even after his return to the United States and after his Israeli lawyer and his father in the West Bank had made critical public statements about the defendant's treatment by the Israeli authorities, there were no repercussions. The defendant claimed, however, that when he was leaving Israel he encountered two individuals he believed to be members of Shin Bet who warned him that if he did anything wrong he would be murdered, but he refused to reveal the names of those two individuals. Nothing happened to the defendant or his family after that warning.

II.  DISCUSSION

A.  Defendant's "Confession"

  The crux of the case is the defendant's claim that he was denied due process when the court admitted the purported English translation of his Arabic "confession" obtained, he says, "through duress and torture in Israel in 1995." Defendant maintains that the district court judge first failed to determine the admissibility of his confession under 18 U.S.C. sec. 3501./3 Defendant's original objection at trial to the use of his statement was to its "relevancy," not its "involuntariness," which he did not raise until mid-trial. That is too late. See Fed. R. Crim. P. 12(b) & (f); Davis v. United States, 411 U.S. 233, 245 (1973). His reliance on sec. 3501(b)-(d) is misplaced. Had the defendant made a timely motion, the government in reply at any resulting suppression hearing was

prepared to call as a government witness Lt. Major Marco Dahan, the Israeli officer who had taken the defendant's statement in Israel, as a government witness. The defendant's mid-trial strategy would have unfairly prejudiced the government's case and, in the case of an adverse ruling, its ability to appeal during trial. The defendant offers no explanation for his delay nor does he make any effort to show "good cause" for the delay. See Fed. R. Crim. P. 12(f); see also United States v. Gibson, 170 F.3d 673, 677-78 (7th Cir. 1999) (holding under Fed. R. Crim. P. 52(b) that failure to make a timely objection constitutes forfeiture of the argument on appeal). Given the defendant's failure to object, we review the district court's decision to admit the evidence for plain error only, United States v. Olano, 507 U.S. 725, 731-35 (1993), and find no error. Even if the district court had erred, the harmless error doctrine applies to involuntary confessions. Arizona v. Fulminante, 499 U.S. 279, 308 (1991). A review of the briefs and the record fully sustains the view that any alleged error was harmless.

Next the defendant complains that the government failed to comply with 18 U.S.C. sec.sec. 3491 et seq. before using the defendant's handwritten Arabic statement./4 The other sections referred to are not applicable. Section 3492 provides a process for a consular official to certify foreign documents; sec. 3493 provides for a deposition to authenticate foreign documents, but that process is not relevant in this case; and sec. 3494 provides for the certification of foreign documents, which is also not applicable. The defendant admitted he wrote his statement out himself. The English translation used by the government was conceded by the defendant to be a "fair translation," except the defendant noted, it referred to Milwaukee as a "state" instead of a city. That was an insignificant and harmless characterization that probably gave the good citizens of Wisconsin and Milwaukee only a chuckle. Again there was no error in the use of the translated version of his statement. At the time the court admitted the statement, the defendant did not raise these objections and his afterthoughts now come too late. There was no error, not even plain error.

## B. Brady Claim

The defendant claims to have suffered a violation of due process under Brady v. Maryland, 373 U.S. 83 (1979), because the government did not disclose to him prior to the close of the case certain possibly exculpatory information. A Brady holding is reviewed for abuse of discretion. United States v. Grintjes, 237 F.3d 876, 880 (7th Cir. 2001).

This issue first came to light in chambers before Judge Castillo on October 20, 2000. While the jury was deliberating, government counsel apologetically advised the court that he had just come across a document "arguably favorable" to the defense. The transcript of what transpired in chambers was sealed because it related to a government document classified as top secret. We have now examined it. The district court judge ultimately concluded that the possible Brady violation by the government was not deliberate and that on its merits there was no reasonable possibility that the outcome of the case could have been affected by the undisclosed information. We fully agree and find no abuse of discretion. The trial judge handled this post-trial development as carefully and considerately as anyone could have done. The undisclosed bit of information could not have been magnified by defendant's counsel so as to make any possible difference, and, in any event, it would have been lost in all the evidence of defendant's guilt. See United States v. Cruz-Velasco, 224 F.3d 654, 662 (7th Cir. 2000).

## C. Admission of Evidence Concerning Hamas

It is well understood that evidentiary rulings by the trial judge are reviewed for an abuse of discretion. United States v. Aldaco, 201 F.3d 979, 985 (7th Cir. 2000). The defendant complained that some of the evidence admitted in the government's rebuttal case was "irrelevant," "collateral," or lacking proper foundation. As the defendant failed to object at trial, the plain error standard of review applies. See United States v. Hughes, 213 F.3d 323, 328 (7th Cir. 2000). There is nothing raised at this late date by defendant

that could possibly have had any substantial effect on the verdict. The result reached was not inconsistent with substantial justice. His late arguments border on the frivolous.

The government called FBI Special Agent Charles Peters as an expert to explain the role and function of Shin Bet in Israel as an agency concerned with internal security, not prosecutions. The agent testified about other facts in the case and stated that he had found no evidence in the record, including in the grand jury transcripts, where the defendant ever expressed any concern for the safety of his family. The defendant offered no timely explanation of why any of the government's evidence was only collateral. He objected to the FBI agent's summary of the record as "hearsay," but he pointed out no error. The defendant has abandoned that objection here. We find no error of any degree.

The airline tickets used by the defendant and his former schoolmate to travel to Damascus in 1992 were admitted into evidence and shown to the jury before the defendant objected to their admission for lack of adequate foundation. On cross-examination the defendant claimed he was not familiar with the tickets. Agent Peters had, as part of his investigation efforts, come into possession of the tickets. With the defendant's handwritten statement that he and Rezeq Saleh had traveled to Damascus in 1992, this provided sufficient foundation for admission of the tickets as evidence for jury consideration. Federal Rule of Evidence 803(6) requiring a business records exception to hearsay did not apply as defendant argues. Contrary to the defendant's claim, it is sufficient that the exhibit supplied strong circumstantial evidence of the accuracy of the defendant's statements to the Israeli authorities. There was no abuse of discretion in admitting this evidence.

The defendant also objects to the admission of evidence about Hamas which was offered by the government's expert witness in response to defendant's efforts to establish a coercion defense. The evidence, which suggested the defendant was attempting to protect Hamas

and Rezeq Saleh, came only in response and in answer to the defendant's explanation. In the government's case-in-chief, the evidence only explained the general nature of the grand jury investigation. Reference was again made to Hamas when the government presented evidence of the defendant's refusal to testify on July 11, 2000. His refusal to testify after being granted immunity, however, is the very basis of the charge in this case. The defendant argues it was a violation of Fed. R. Evid. 403. His explanation is that the government's Hamas evidence was intended "to brand Defendant with a huge scarlet 'H,' to paint Defendant with provocative evidence [to characterize him] as a murderous, bloodthirsty Hamas terrorist seeking to protect his 'buddies.'" That argument is colorful and imaginative, but we find no basis for it in the record. There was no abuse of discretion in the admission of the Hamas evidence.

The defendant's other objections to the evidence are without merit. Agent Peters' testimony about Shin Bet was without objection at the time. The defendant further objects to Agent Peters' testimony concerning his review of the transcripts in relation to whether the defendant ever stated he feared for his safety. The defendant's objection now is that it was hearsay, but Fed. R. Evid. 1006 specifically permits voluminous writings as a practical matter to be sum marized. The defendant did not cross-examine Agent Peters on this issue. We find no error.

D.  Sentencing Issues

Defendant was convicted of criminal contempt in violation of 18 U.S.C. sec. 401(3), but the sentencing problem arises as criminal contempt does not have a separate guideline as explained in the United States Sentencing Guidelines ("U.S.S.G." or the "guidelines") sec. 2J1.1, comm. n.1 (2000). The circumstances ordinarily surrounding contempt do not fit a pattern and there is the additional important need "to vindicate the authority of the court." Id. Although the court is referred to sec. 2X5.1 to apply the most analogous offense guideline, sec. 2J1.1 recognizes that in some cases a defendant's conduct may justify the application of sec. 2J1.2

for obstruction of justice. Sentencing under the criminal contempt statutes, 18 U.S.C. sec. 401 or Fed. R. Crim. P. 42, is a matter of discretion, see Green v. United States, 356 U.S. 165, 188 (1958), in which "we must place great reliance on the district court's decision." United States v. Monteleone, 804 F.2d 1004, 1011 (7th Cir. 1986). The findings of fact in a district court's sentencing determination are reviewed for clear error. See United States v. Hickok, 77 F.3d 992, 1007 (7th Cir. 1996).

Judge Castillo, who listened to the trial evidence and considered the cases cited by the defendant and the government (which need not be individually reviewed here), adopted the probation officer's presentence report and made the finding that "in no uncertain terms" the defendant's refusal to testify "was an effort to obstruct an ongoing criminal investigation into potential criminal activities by various individuals and various organizations." The judge branded the defendant's explanation of fearing for the safety of himself and his family and his explanation of his travel to the Middle East as perjurious. The trial judge's view of the situation and his application of sec. 2J1.2 is fully sustained by a review of this record.

The defendant also attacks the sentence claiming there was no evidence to support sentencing under sec. 2J1.2(b)(2), which provides for a 3-level enhancement for "substantial interference with the administration of justice." The district court's factual findings to support an enhancement must be based on a preponderance of the evidence. See United States v. White, 240 F.3d 656, 660 (7th Cir. 2001). The record fully justifies the district court's findings as to the enhancement. In addition, the defendant claims the most analogous offense to his crime is failure to appear by a material witness under 18 U.S.C. sec. 3146(b)(1)(B), which carries a one-year maximum sentence. It is easily seen in the context of this case that section is not applicable.

The defendant further claims the district court erred by refusing to depart downward based on his torture by Israeli security forces. This is not a case where the court misapplied the

guidelines in violation of the law. See United States v. Parolin, 239 F.3d 922, 928 (7th Cir. 2001) (holding that questions of law relating to interpretation of the guidelines are reviewed de novo). It was a discretionary decision of the district court not to depart downward which leaves this court without jurisdiction. There is no suggestion that this experienced district judge believed he could not depart downward, or that the law did not permit that possibility. In those instances, a remand would be in order. See, e.g., United States v. Vahovick, 160 F.3d 395, 398-99 (7th Cir. 1998). There is absolutely nothing in the record of this case as it unfolded to suggest the slightest reason for a downward departure.

## III. CONCLUSION

This unusual case was carefully handled by the district judge. We find no error and the case is affirmed in all respects.

AFFIRMED.

FOOTNOTES

/1 To place the charged violation in context, the complete sec. 401 follows:

Sec. 401.  Power of court

A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as:

(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

(2) Misbehavior of any of its officers in their official transactions;

(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

/2 Appellant's brief in its Statement of Facts contains only a procedural history of the case contrary to Fed. R. App. P. 28(a).

/3 18 U.S.C. sec. 3501 sets forth the requirements for determining the admissibility of confessions and states that a confession will be admitted only "if it is voluntarily given." 18 U.S.C. sec.

3501(a).

/4 18 U.S.C. sec. 3491, Foreign documents, provides in full:

Any book, paper, statement, record, account, writing, or other document, or any portion thereof, of whatever character and in whatever form, as well as any copy thereof equally with the original, which is not in the United States shall, when duly certified as provided in section 3494 of this title, be admissible in evidence in any criminal action or proceeding in any court of the United States if the court shall find, from all the testimony taken with respect to such foreign document pursuant to a commission executed under section 3492 of this title, that such document (or the original thereof in case such document is a copy) satisfies the authentication requirements of the Federal Rules of Evidence, unless in the event that the genuineness of such document is denied, any party to such criminal action or proceeding making such denial shall establish to the satisfaction of the court that such document is not genuine. Nothing contained herein shall be deemed to require authentication under the provisions of section 3494 of this title of any such foreign documents which may otherwise be properly authenticated by law.