# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 02-2729

LEONARD HINTON,

Petitioner-Appellant,

v.

ALAN M. UCHTMAN,[*]

Respondent-Appellee.

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 1980—**Elaine E. Bucklo**, *Judge.*

———————

ARGUED MAY 15, 2003—DECIDED JANUARY 26, 2005

———————

Before BAUER, COFFEY, and WOOD, *Circuit Judges.*

COFFEY, *Circuit Judge.* On September 13, 1985, Leonard Hinton was convicted of murdering John Durham, Dorothy McDaniel, and Edward Bradley and sentenced to life in prison. The Illinois Appellate Court, on direct appeal, up-

———————

[*] Alan M. Uchtman, the current warden of the Menard Correctional Center where Hinton is presently confined, has been substituted for Eugene McAdory as respondent pursuant to Fed. R. App. P. 43(c).

held Hinton's conviction on three counts of murder. Hinton responded with the filing of a *pro se* post-conviction petition in the circuit court alleging a laundry list of constitutional violations, which was denied and affirmed by the Appellate Court of Illinois. Thereafter, Hinton filed a petition for a writ of habeas corpus in federal court alleging that the police obtained his signed confession through physical coercion, abuse and police brutality and claimed that the admission of his confession at trial was a violation of his Fifth Amendment rights. The district court ruled that Hinton's Fifth Amendment claim did not warrant habeas relief; concluding that any error arising from the admission of his confession was harmless when one considers that the State produced an overwhelming amount of evidence of his guilt separate and distinct from the confession. We affirm.

## I.  Background

In the early morning hours following Thanksgiving Day 1983 in Chicago, Illinois, John Durham, Dorothy McDaniel, and Edward Bradley were in the kitchen of Durham's apartment when Hinton stopped in to collect a drug debt from Durham. According to Hinton, after Durham refused to pay the debt Hinton pulled a loaded .38 revolver from his coat. Durham allegedly tried to grab the weapon, and Hinton shot him in the chest and head, killing Durham. Hinton also shot and killed McDaniel and Bradley, striking each of them behind the ear at the base of the skull (gangland style). Chicago police officers called to the scene found all three victims lying in a pool of blood.

At this time, the officers' only lead as to the identity of the murderer came from one of Durham's neighbors, Diane Staton, who told police that immediately after hearing shots fired from the direction of Durham's apartment, shortly after 12 a.m. on November 25, 1983, she observed a man with a gun walking backwards out of Durham's apartment.

Staton told police that she had viewed the suspect from her upstairs bedroom window across the street from Durham's apartment. Staton went on to explain that the entire area around Durham's apartment was well-lit and she had an opportunity to see the man's face when he turned around and looked in her direction as he was fleeing from the scene. Staton's initial description of the man was that he was black, about six-foot-two, between 180 and 200 pounds and in his mid-twenties. Staton subsequently identified Hinton as the man she saw that night in a police lineup, as well as in court during the trial.

Later that day, November 25, 1983, at about 5 p.m., the police arrived at Hinton's apartment and, after investigating an unrelated aggravated battery charge, they arrested him, advised him of his *Miranda* rights and conveyed him to Area 2 police headquarters ("Area 2"). While Hinton was detained on the battery charge, an undisclosed informant gave police information that led them to suspect that Hinton was responsible for the three murders. At this time police also became aware that Hinton matched the physical description of the person Staton had observed exiting Durham's apartment. Armed with this information, the police brought Staton to the station and arranged a physical lineup with the suspect, Hinton, and four other African-American males similar in age, stature, build and complexion to ascertain whether Staton could identify Hinton as the person she witnessed exiting the murder scene. Upon viewing the lineup, Staton identified Hinton as the individual she observed standing in Durham's doorway with a gun in his hand shortly after 12 a.m. on the morning of November 25, 1983.[1]

After her positive identification of Hinton in the lineup, police once again advised the suspect, Hinton, of his *Miranda* rights and proceeded to question him about the

---

[1] Staton's identification was made around 10 p.m. on November 25, 1983, less than 24 hours after the triple murder.

triple homicide. In the course of their investigation the officers questioned David Dixon, one of Hinton's associates. Dixon denied any involvement in the murders, but revealed that shortly after the murders Hinton told him that he had just shot a couple of people and asked Dixon to sell his .38-caliber gun. Dixon went on to tell the police that, at Hinton's direction, he had traded the gun to a man he knew named James Randall for cocaine. Thereafter, the officers questioned Randall, who produced the .38-caliber weapon and confirmed that he had received it from Dixon.

With the suspected murder weapon in police custody (ballistics tests later established that Hinton's .38 was the murder weapon), the police continued to question Hinton about the murders. Initially, Hinton denied being present at the murder scene and came up with an alibi, telling police and Asst. State's Attorney Lori Levin ("A.S.A. Levin"), who had been called in to take Hinton's statement, that he was at home playing cards with his family on the evening of the murders. However, Hinton's family refused to corroborate his fabricated alibi and, after police confronted him with this information, he changed his story and admitted that he was present at the scene of the murders and that he was responsible for the deaths of Durham, Bradley, and McDaniel.

Following his confession Hinton was interviewed for a second time by A.S.A. Levin, on November 27, 1983, at 3:30 p.m., in the presence of a stenographer. During the interview, Hinton gave another, this time more detailed "confession" in which he accepted responsibility for the three murders. However, in this statement Hinton attempted to paint an implausible picture as to how the homicides occurred. Hinton told A.S.A. Levin that he shot and killed Durham in self defense during an altercation the two had over a drug debt and that Bradley and McDaniel had been shot "accidently." According to Hinton, he went to Durham's house to collect a drug debt, but encountered Durham, Bradley and McDaniel when he entered the kitchen to

demand his money. Durham refused to pay the drug debt and ordered Hinton to leave. Hinton next stated that he "got [his loaded] .38 [caliber gun] out of [his] coat," and "cocked it" (the gun's hammer), at which time Durham allegedly made an attempt to grab the weapon and the two started fighting. As they struggled, Hinton claimed his weapon just "went off" four times, hitting both McDaniel and Bradley, before he shot Durham directly in the chest. After being shot once, Hinton recounted that Durham staggered to his feet and he (Hinton) shot him again before exiting the house. However, Hinton's description of events was in sharp contrast to the physical evidence the police discovered about the execution-style slayings during their investigation of the crime scene.

After Hinton's statement was transcribed by the stenographer, A.S.A. Levin read the statement aloud to Hinton and suggested that he follow along so that he could make any changes that he thought were needed to accurately reflect the content of his transcribed statement. Hinton proceeded to read, approve and initial each page; and then duly signed the last page of the document. Shortly thereafter, Hinton was charged with the murders of Durham, McDaniel, and Bradley, and entered a plea of not guilty to each count. Hinton then filed a pretrial motion to suppress his written confession statement given to Levin, claiming that it was involuntary because it was the product of police brutality.

### A. Suppression Hearing

The trial judge held a hearing on June 11, 1985 in response to Hinton's motion to suppress. During the hearing, Hinton testified on direct examination that he was repeatedly physically abused and assaulted by police officers during the nearly forty-six hours he was in custody[2] before

---

[2] This time period includes the additional time he was confined

(continued...)

he gave his confession. He alleged that while he was hand-cuffed to a wall in the interrogation room, officers repeatedly kicked him in the stomach, slapped him in the face, and punched him in the head. Hinton further stated that, at one point during his confinement, officers placed a plastic bag over his head and deprived him of air, denied him water and food, and prohibited him from using the bathroom for a period of eighteen hours. Hinton testified that he finally yielded to the police officers' demands and gave a confession statement to Levin only after officers had escorted him down to the basement of the police station and applied an electric shock rod to his genitals and his rectum—Hinton said he confessed to the three murders within a short period of time after this episode allegedly occurred. However, when questioned on cross-examination about whether he had truly sustained any injuries from the alleged assaults, Hinton admitted that he was not bleeding nor did he have any bruises on his body (after allegedly being assaulted, hit in the head and kicked in the stomach repeatedly). Nonetheless, Hinton went on to state that after one officer allegedly struck him on the chin, he did have a laceration on his face that bled onto the "jersey" he was wearing at the time.[3] Later in the suppression hearing, the prosecutors asked Hinton whether the statement he had given to Levin concerning the murders was fabricated. Hinton replied that he "made [up] the whole [confession] statement," and that he was "never there at the scene of the murder[s]."

---

[2] (...continued)
while questioned on the aggravated battery charge. Police did not begin questioning Hinton concerning the murders until after Staton viewed the police lineup.

[3] In his testimony at the suppression hearing, Hinton referred to being cut on his chin and then bleeding onto his "jersey" a number of times. However, the record is clear in reflecting that Hinton did not introduce his alleged "blood-stained jersey" at any time during his suppression hearing. Thus, this "evidence" was not before the court when it ruled against Hinton on the motion to suppress.

After Hinton finished testifying, the State called a number of rebuttal witnesses, including a Lt. Jon Burge of the Chicago Police Department, the officer in charge of the Area 2 precinct at the time of Hinton's arrest and interrogation, who testified that he had neither threatened nor assaulted Hinton at any time, nor had he witnessed any other officer assault Hinton. Additionally, police officers Leonard Bajenski, Thomas Krippel, and Patrick Mokry—all of whom were present during Hinton's interrogation—stated that they had neither struck nor assaulted him, nor did they threaten him in any manner at any time before, during, or after his questioning. The officers further testified that, although Hinton was detained on the aggravated battery charge for nearly two days before he was charged with the murders, he was questioned about the murders on only five occasions, and each period of questioning only lasted between ten and forty-five minutes. During the remaining time Hinton was in custody (while the officers questioned witnesses and continued to investigate the crime scene), the officers stated that Hinton was allowed to sleep if he wished and that he was fed and given soda on several occasions.

Assistant State's Attorney Levin likewise testified at the suppression hearing that, after she had properly Mirandized Hinton, he acknowledged that "he understood each and every one of his *Miranda* rights, and that he wished to speak to [her ]" about the murders. In addition, Levin stated that, at no time during the interview nor at any other time, did Hinton complain to her about any physical abuse, nor did he request counsel. Levin further stated that, after Hinton gave his statement admitting responsibility for the murders, the statement was transcribed and read aloud to him, and he was given an opportunity to review it in typewritten form before he initialed and approved each page and signed the last page. When Levin was asked if Hinton had given her any reason as to why he finally decided to give the confession, Levin said that Hinton had told her that "he had thought

about what had happened . . . [and] that he wanted to tell the truth."

After hearing and weighing the conflicting accounts presented by Hinton and the State's witnesses, the trial judge concluded that the testimony and evidence adduced at the suppression hearing presented a "credibility question" and that, "based on what [he] heard and the demeanor of the witnesses and the like, and the evidence presented," Hinton's motion to suppress should be denied. After the judge denied the motion, Hinton waived his right to a jury trial, the judge accepted the waiver and the case proceeded to a trial before the court.

### B. Bench Trial

Hinton's trial commenced on July 8, 1985, less than a month after the suppression hearing. Hinton chose to testify in his own defense and offered testimony that was similar in all material respects to the pretrial confession he had given to Levin, and once again he implausibly claimed to have fired his weapon at the victims in self-defense. As in his confession statement, Hinton admitted that he went to Durham's house the night of the murders to collect a drug debt, and during an ensuing altercation with Durham concerning the debt, the two "wrestled over [his .38-caliber weapon]." As the two struggled over control of the gun, Hinton claimed that Durham "made me pull the trigger" "three . . times," striking Durham, McDaniel, and Bradley. Hinton stated further that following his struggle with Durham, he "shot him . . . twice or three times" and "ran out of the door [of the apartment]." When questioned on cross-examination, Hinton acknowledged that after he left the murder scene he asked Dixon to sell the .38-caliber gun used in the shootings and further stated that the confession he gave to the Assistant State's Attorney (implausibly

claiming that the shootings were in self-defense) was an accurate account of what occurred the night of the murders.

The evidence and testimony presented by the State, however, overwhelmingly established Hinton's guilt beyond a reasonable doubt as to each and every element of the murders charged. The State's evidence conclusively proved that Hinton's actions on the night of the murders were not taken in self-defense, but instead were "voluntarily and wilfully committed act[s], the natural [result] of which was to cause death or great bodily harm" to Durham, McDaniel and Bradley. *People v. Lee*, 628 N.E.2d 436, 440 (Ill. App. Ct. 1993). Diane Staton assisted in providing identification testimony linking Hinton to the murders, testifying that, just after she heard five shots fired from the direction of Durham's apartment on the night of the murders, she looked out her bedroom window and saw an individual matching Hinton's physical description walking backwards out of Durham's apartment with a gun in his hand, and that she was able to get a good look at the suspect when he "turned around [and] turned directly toward [her]." Staton then reaffirmed the positive identification she made of Hinton in the police lineup at Area 2 the morning after the murders. When asked at trial to identify the individual she had identified in the police lineup from the witness stand, Staton pointed to Hinton.

The State presented additional testimony and evidence linking Hinton to the murder weapon as well as the murders themselves. David Dixon testified that, as he had told the police during the course of the investigation, approximately two hours after the murders Hinton stated that he had just shot a person who owed him money, and furthermore that he "had to shoot a couple of people." Dixon went on to state that Hinton had told him that he had gone to Durham's house "to rob him." According to Dixon, Hinton, after the murders, asked Dixon to sell his .38-caliber pistol;

the gun that the police subsequently tracked down and, after testing and examination, established as the murder weapon. Dixon next stated that he later sold the gun to a man named James Randall. The State corroborated Dixon's testimony concerning the sale of the murder weapon to Randall with the testimony of Detective Thomas Kripple of the Chicago Police Department, who recounted that after questioning Randall concerning the whereabouts of the .38-caliber weapon he received from Dixon, Randall delivered the weapon to Kripple at the Area 2 station. The State also submitted Hinton's signed statement (given to A.S.A. Levin) in which he confessed to having fired the weapon that killed Durham, Bradley and McDaniel in support of its theory that Hinton had indeed committed the three murders charged. Additionally, the State presented the testimony of two forensic medical examiners and a ballistics expert who each identified the .38-caliber weapon brought to the station as having been used in the triple murders charged to Hinton.[4]

The State also presented testimony from the State's medical examiners, Dr. Choi and Dr. Beamer, about the victims' causes of death and the location of their gunshot wounds. The doctors' testimony made clear that the murders were carried out in a manner completely contradictory to that of Hinton's fairy-tale recitation that he had shot the three victims in self-defense. Indeed, both Dr. Choi and Dr. Beamer's testimony established that the murders were carried out in a vicious and methodical manner, with all

---

[4] The State's two medical examiners, Dr. Lee Beamer and Dr. Eupil Choi, stated that during their pathological examinations they removed five bullets in total from the victims' bodies, two bullets each from Durham and Bradley's bodies and one from McDaniel's. The State's ballistics expert testified that he examined the five bullets and determined that all the bullets were discharged from Hinton's .38-caliber weapon.

three victims being shot in the head at close range.[5]

After weighing the totality of the evidence against Hinton, the judge rejected his implausible explanation that he had shot the victims in self-defense and found Hinton guilty of having intentionally murdered Durham, McDaniel and Bradley. *See* Ill. Rev. Stat. 1983, ch. 38, ¶ 9-1(a)(1)-(2). After the filing of the pre-sentence report and the sentencing hearing, the judge sentenced Hinton to concurrent terms of life imprisonment as to each count, without the possibility of parole. Hinton appealed his convictions and the sentences imposed, but did not appeal the trial court's denial of his motion to suppress.

### C. Post-Conviction Proceedings

After an unsuccessful direct appeal, Hinton filed a post-conviction petition in the Circuit Court of Cook County, claiming that the Chicago Police had violated his Fifth Amendment protection against self-incrimination by illegally coercing his confession. According to his petition, police officers coerced him into confessing to the murders by allegedly "physically beating" and "electrocut[ing]" him. In support of his claim, Hinton presented court documents, published reports, court opinions and newspaper articles detailing complaints by other criminal detainees who claimed

---

[5] Dr. Choi explained that Durham died as a result of a gunshot wound to the right temple at close range, and furthermore he had received another gunshot wound to the chest. Dr. Beamer stated that after examining Bradley and McDaniel to determine the cause of their respective deaths, he concluded that both victims died after they were struck by individual bullets that lodged behind the left ear of each at the base of the skull. Additionally, Dr. Beamer said that both victims had "symmetric epidermal abrasions"—or powder burns—surrounding their wounds, establishing that they were shot at close range. Dr. Beamer also determined that Bradley was shot once in the back.

that they had also been physically assaulted and coerced into giving confessions by police officers while confined at Area 2 (including Lt. Burge; the officer in charge at the time of Hinton's interrogation). *See, e.g., People v. Hobley*, 637 N.E.2d 992 (Ill. 1994); *People v. Wilson*, 506 N.E.2d 571 (Ill. 1987).

Included in Hinton's presentation were the February 1993 findings of the Chicago Police Board's investigation into allegations of police abuse at Area 2 concerning the time frame in question. The report concluded that "[Lt.] Burge . . . should be separated from the [Police] Department" as a result of his improper treatment of a murder suspect (Andrew Wilson, *see People v. Wilson*, 506 N.E.2d 571). Hinton requested an evidentiary hearing in order to develop this "newly-discovered" evidence that his confession was the product of police coercion.

The circuit judge dismissed Hinton's petition after concluding that Hinton's "newly-discovered" evidence of police brutality at Area 2 did not entitle him to an evidentiary hearing. The judge concluded that the "evidence" Hinton presented in his post-conviction petition was insufficient to demonstrate any likelihood that his confession was coerced. Furthermore, the judge, after reviewing all of the testimony, found that Hinton had failed to present sufficient evidence that he was physically injured in a manner "consistent with police brutality," and had "not provided a scintilla of direct evidence to suggest" that the police officers who testified at his suppression hearing gave "perjurious testimony" when they "denied [that they had] physically abus[ed] Hinton [during his custody]." Hinton appealed the circuit court's decision, and the state appellate court affirmed the judgment. Thereafter the Illinois Supreme Court denied review.

Subsequently, Hinton filed a petition for a writ of habeas corpus in federal court, claiming that the admission of his

confession at trial violated his Fifth Amendment protection against self-incrimination because he had been forcibly coerced into giving it. Hinton requested, but was denied, an evidentiary hearing to allow him to develop his claim that his "newly-discovered" evidence of police abuse at Area 2 demonstrated that his confession was coerced. *See Townsend v. Sain*, 372 U.S. 293, 312-14 (1963)*, overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992). The district court concluded that even if Hinton's confession was coerced (and thus should not have been admitted at trial), the judge's decision to allow it in evidence was harmless in view of the overwhelming evidence of guilt the State had introduced, independent of the confession. Accordingly, the district court denied Hinton's petition for habeas relief. Hinton appealed, and we granted a certificate of appealability to consider whether Hinton's confession should have been admitted at trial, and whether its admission prejudiced his defense.

## II. Analysis

Our review of the state courts' adjudication of Hinton's alleged involuntary confession claim is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (codified at 28 U.S.C. § 2254).[6] Under the AEDPA, a state prisoner who

---

[6] The Respondent argues that Hinton's Fifth Amendment claim has been procedurally defaulted because Hinton failed to "fairly present" this claim to the Supreme Court of Illinois. We disagree. In his petition for leave to appeal to the Supreme Court of Illinois, Hinton relied on Illinois and United States Supreme Court cases that address involuntary confession claims, made explicit reference to his Fifth Amendment rights in the context of his claim that he was "coerced to confess," and also went into significant

(continued...)

petitions for a writ of habeas corpus must establish that the state courts' adjudication of his case was "contrary to, or involved an unreasonable application of, clearly-established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1) & (2). We review these questions *de novo. Schaff v. Snyder*, 190 F.3d 513, 522 (7th Cir. 1999).

Hinton argues that the Illinois courts' application of clearly established federal law governing the voluntariness of confessions, *see Miller v. Fenton*, 474 U.S. 104, 109-110 (1985), to the facts of his case was unreasonable.[7] *See* 28 U.S.C. § 2254(d)(1). He posits that he presented the state courts with sufficient "newly-discovered" evidence concerning alleged abusive police conduct at the Chicago Police Department Area 2 to demonstrate that his confession was coerced and thus should not have been admitted at his trial.

Hinton faces an uphill battle (as he did in the three other courts to render a decision on the same facts) in his attempt to convince us that the trial judge's decision to admit his confession was in error. The only "evidence" that Hinton

---

[6] (...continued)
factual detail regarding his alleged abuse at the hands of police. *See Ellsworth v. Levenhagen*, 248 F.3d 634, 639 (7th Cir. 2001). Accordingly, we conclude that Hinton did indeed sufficiently allege the substance of his Fifth Amendment coerced confession in front of the Illinois Supreme Court, and we therefore have jurisdiction to reach the merits of Hinton's claim.

[7] Respondent argues that Hinton's petition should be evaluated under § 2254(d)(2) instead of § 2254(d)(1). However, whether Hinton's confession should have been admitted at his trial is a "mixed question of fact and law," *Miller*, 474 U.S. at 112, subject to review under § 2254(d)(1). *See Porter v. Gramley,* 112 F.3d 1308, 1313 (1997)

produced at his suppression hearing in support of his coerced confession claim was his own self-serving state-ments and testimony. However, he failed to corroborate his allegations of the physical abuse that he alleged he sustained with any evidence,[8] such as eyewitness reports, medical records, and /or photographs, in support thereof, *see Wilson v. City of Chicago*, 6 F.3d 1233, 1236 (7th Cir. 1993). In-deed, his failure to produce any corroborating eyewitness testimony, medical records or supporting evidence at the suppression hearing, dealing with the injuries he alleges he sustained while in custody, significantly undermines his involuntary confession claim. *See Mahaffey v. Schomig*, 294 F.3d 907, 917 (7th Cir. 2002). Because Hinton failed to offer any evidence at the suppression hearing aside from his own testimony, he presented the trial judge with a clear question of the credibility of the witnesses, which was properly resolved in the State's favor. On habeas review, we are required to accord credibility determinations by a state trial court a "presumption of correctness," and we can only dis-turb the court's conclusions if Hinton demonstrates with "clear and convincing evidence" that its determinations were erroneous. *See* 28 U.S.C. § 2254(e)(1); *Sprosty v. Buchler*, 79 F.3d 635, 643 (7th Cir. 1996).

However, we need not determine if the "newly-discovered" evidence Hinton presented regarding abusive police prac-tices at the Area 2 station is sufficient to demonstrate by <u>clear and convincing</u> evidence that the trial court's credibil-

---

[8] Hinton maintains that his "blood-stained jersey" is evidence of his injuries while in custody. However, because Hinton failed to produce this evidence at the earlier suppression hearing even though it was available for production at the time, his "blood-stained jersey" will not be considered as newly discovered evidence that satisfies the AEDPA's mandate that evidence sought to be intro-duced in an evidentiary hearing must be evidence that "could not have been previously discovered through the exercise of due dil-igence." 28 U.SC. § 2254(e)(2)(A)(ii).

ity determinations were erroneous, because any potential error caused by the admission of his confession was harmless in light of the wealth of evidence of his guilt, *separate and distinct from his confession*. *See, e.g., Hopkins v. Cockrell*, 325 F.3d 579, 585 (5th Cir. 2003); *Johnson v. Cain*, 215 F.3d 489, 497 (5th Cir. 2000). Even were we to assume that Hinton's confession was coerced and should not have been admitted at trial, he is only entitled to habeas relief if the state court's admission of his allegedly coerced confession actually *caused* his custody. *Aleman v. Sternes*, 320 F.3d 687, 690 (7th Cir. 2003). However, if the constitutional error alleged on the part of the state court did not cause Hinton's custody, then the error is harmless and the writ should not issue. *Id.* This court has previously held that the harmless error doctrine applies to alleged coerced confessions. *Arizona v. Fulminate*, 499 U.S. 279, 308 (1991); *United States v. Alwan*, 279 F.3d 431, 438 (7th Cir. 2002). When applying the harmless error doctrine on collateral review, we may only grant Hinton's petition for a writ of habeas if we conclude that the admission of his confession "had substantial and injurious effect or influence in determining the jury's verdict," which it did not. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also Aleman*, 320 F.3d at 690 (holding that the *Brecht* standard applies on federal collateral review, even after passage of the AEDPA).

Hinton somehow contends that without the confession, the trial court would have been "reluctant" to convict him and also argues that the trial court's admission of his confession was not harmless. Aside from the confession, Hinton claims the State had no evidence that linked him to the crime except for the testimony of Diane Staton and David Dixon, which Hinton attempts to characterize as "weak and unreliable." We disagree and conclude that the trial court would have convicted him even if the confession were not introduced at trial due to the wealth of other corroborating

evidence that the State produced which established Hinton's guilt beyond a reasonable doubt.

Hinton himself provided much of the evidence that the State needed to establish his guilt. At trial, Hinton voluntarily took the witness stand and admitted that, on the night of the murders, he went to Durham's house armed with a loaded .38-caliber pistol and fired five shots killing Durham, McDaniel, and Bradley. Hinton also bolstered any "weakness" or "unreliability" in Staton's testimony by corroborating Staton's identification of him when admitting that he was the gunman that she saw backing out of Durham's apartment. *See United States v. Crotteau*, 218 F.3d 826, 833 (7th Cir. 2000); *People v. Mahaffey*, 742 N.E.2d 251, 266 (Ill. 2000); *People v. Herrett*, 561 N.E.2d 1, 6 (Ill. 1990). Dixon's testimony regarding Hinton's admissions the day of the murders was also corroborated when Hinton testified on the witness stand that he shot the three victims and subsequently gave Dixon the murder weapon and asked him to sell it. *See United States v. Curtis*, 324 F.3d 501, 507 (7th Cir. 2003) (stating that party admissions are reliable evidence if sufficiently corroborated). In addition, the State provided supplemental evidence demonstrating both Hinton's presence at the crime scene and his use of the recovered .38 pistol to kill the three victims.[9] This is not to mention that the two medical examiners who testified at trial completely destroyed Hinton's fabricated self-defense argument by testifying that the manner in which the victims were killed suggested that they were executed gangland style rather than accidentally struck during a

---

[9] Recall that the State's ballistics experts testified that this gun was in fact the weapon used to commit the murders, and the State tied Hinton to the gun through his own testimony, and that of Dixon and Officer Kripple. *See People v. Brown*, 661 N.E.2d 287, 296 n.1 (Ill. 1996).

struggle, as Hinton claimed.[10] Indeed, the witnesses at trial (both Hinton and the State's) repeated, in all significant respects, the incriminating portions of Hinton's pretrial confession statement. Therefore, the confession statement itself was merely cumulative and even if we were to assume that its admission at trial was erroneous, any error would be harmless.[11] *See Brecht*, 507 U.S. at 639*; United States v. Thompson*, 286 F.3d 950, 962 (7th Cir. 2002).

Thus, even if we were to assume that the admission of Hinton's confession was in error, a question which we do not reach, the confession did not cause a "substantial and injurious effect or influence in determining [the] verdict"

---

[10] *See supra* note 5, at p. 11 *and accompanying text.*

[11] Hinton contends that the admission of his confession "prejudiced [his] defense because it forced him to change his trial strategy" in that "he would not have testified" at his trial were it excluded (he also asserted in his reply brief that had his confession been suppressed the State may have offered him a plea, and claimed at oral argument that he would have opted for a jury trial instead of a bench trial, arguments we do not consider because he waived them by not presenting them in his opening brief, *United States v. Collins*, 361 F.3d 343, 349 (7th Cir. 2004)). The Supreme Court, however, has rejected such attempts on the part of criminal defendants to play Monday morning quarterback when their trial strategies turn sour and do not produce the sought-after results. *See Ohler v. United States*, 529 U.S. 753, 755, 757 (2000) ("the defendant in a criminal trial must make choices as the trial progresses" . . . "a party introducing evidence cannot complain on appeal that the evidence was erroneously admitted"); *see also United States v. Saunders*, 359 F.3d 874, 878 (7th Cir. 2004). Hinton, with the assistance of counsel, chose freely and voluntarily to testify, and he is bound by this decision. He cannot afterward, when his choice to testify yields negative consequences, turn around, and on collateral attack, attribute the effects of his decision to an alleged error in an evidentiary ruling by the trial court. *See Ohler*, 529 U.S. at 758.

against him, and as a result any possible error in its admission was harmless. *Brecht*, 507 U.S. at 637. Accordingly, he is not entitled to a writ of habeas corpus.

AFFIRMED.

WOOD, *Circuit Judge,* concurring. While I agree that the district court correctly denied Leonard Hinton's petition for a writ of habeas corpus under 28 U.S.C. § 2254, given the stringent standards for relief that apply to such claims, I see this as a much closer case than the majority does. Hinton raised a serious challenge to his conviction. He loses, however, because the state court's conclusion that the tainted confession did not affect the outcome of Hinton's trial was not downright unreasonable. Nevertheless, the claim Hinton has made regarding his confession illustrates dramatically the high price our system of criminal justice pays when police abuse runs rampant: a cloud hangs over everything that the bad actors touched, whether or not they did anything wrong on a particular occasion.

In his § 2254 application, Hinton argued that his confession to the police was the result of a nightmarish course of torture (including having a suffocating plastic bag put over his head, being kept from the toilet, being hung from a pole near the ceiling, and having his genitals and rectum shocked) that had lasted over a period spanning several days. Had he not admitted to the murders in his coerced confession, he continues, he would not have testified as he did at the trial, and the remainder of the state's case (which included no physical evidence linking him to the scene) would have looked far weaker. The state court evaluated the record as a whole, as my colleagues have recounted, and

it concluded that enough evidence existed that was completely independent of the confession to make it confident that any error in the admission of the confession was harmless. That finding is not so far-fetched that it can be labeled unreasonable, as the term is defined for AEDPA.

Nonetheless, as Hinton's appellate lawyers have pointed out to this court, a mountain of evidence indicates that torture was an ordinary occurrence at the Area Two station of the Chicago Police Department during the exact time period pertinent to Hinton's case. Eventually, as this sorry tale came to light, the Office of Professional Standards Investigation of the Police Department looked into the allegations, and it issued a report that concluded that police torture under the command of Lt. Jon Burge—the officer in charge of Hinton's case—had been a regular part of the system for more than ten years. And, in language reminiscent of the news reports of 2004 concerning the notorious Abu Ghraib facility in Iraq, the report said that "[t]he type of abuse described was not limited to the usual beating, but went into such esoteric areas as psychological techniques and planned torture." The report detailed specific cases, such as the case of Andrew Wilson, who was taken to Area Two on February 14, 1982. There a group led by Burge beat Wilson, stuffed a bag over his head, handcuffed him to a radiator, and repeatedly administered electric shocks to his ears, nose, and genitals. See *People v. Wilson,* 506 N.E.2d 571 (Ill. 1987). Burge eventually lost his job with the police, though not until 1992. See *In the Matter of the Charges Filed Against Jon Burge,* No. 91-1856 (Chicago Police Board, February 11, 1993). To this day, Burge has not been prosecuted for any of these actions, though it appears that he at least thinks that he may still be at some risk of prosecution. See, for example, "Cop brutality probe must be thorough, fair," Chi. Sun-Times, May 16, 2002 (editorial); Hal Dardick, "Burge repeatedly takes 5th; Former police commander stays mum on torture questions," Chi. Tribune, Sept. 2,

2004 (noting allegations that Burge or people reporting to him had tortured 108 Black and Latino suspects between August 1972 and September 1991).

It is of course possible—one would hope even likely—that Burge did not torture every single suspect who crossed his path. Thus, it was not enough for Hinton to show that Burge had tortured or supervised the torture of a substantial number of other arrestees. Hinton had to offer some evidence indicating that he himself was the victim of this abuse. His task here was exceedingly difficult. First, the trial court resolved critical issues of credibility against him: it did not credit his account of the torture at all, given the lack of markings on his body or other corroborative evidence. Second, the state court found that the alleged blood-stained jersey that Hinton argued should have been introduced into evidence was not the clear evidence of injury Hinton believed it to be. Third, Hinton did admit to the killings at the trial, even though he attempted to characterize them as self-defense or accidents. Coercion or even torture at the confession stage did not give him license to commit perjury. The jury was fully entitled to take this evidence into account and decide how plausible Hinton's spin on it was.

For these reasons, I conclude that the district court correctly denied Hinton's petition. I do so, however, aware that there is some risk of error in every decision that a court makes. Behavior like that attributed to Burge imposes a huge cost on society: it creates distrust of the police generally, despite the fact that most police officers would abhor such tactics, and it creates a cloud over even the valid convictions in which the problem officer played a role. Indeed, the alleged conduct is so extreme that, if proven, it would fall within the prohibitions established by the United Nations Convention Against Torture ("CAT"), which defines torture as "any act by which severe pain or

suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession . . .," thereby violating the fundamental human rights principles that the United States is committed to uphold. It is somewhat disturbing, given the gravity of the problem, to label what happened as "harmless" error. Nevertheless, I know of no clearly established Supreme Court case that would have required the state court to recognize the error as structural in nature. To the contrary, the Court has used the harmless error doctrine in involuntary confession cases, although it has never done so when the coercion rose to the level of torture. See *Arizona v. Fulminante*, 499 U.S. 279, 285 (1991); *cf. Brown v. Mississippi,* 297 U.S. 278 (1936) (holding that convictions resting solely on confessions that were "extorted by officers of the State by brutality and violence" violated the due process clause and the admission of which at trial was "a wrong so fundamental that it made the whole proceeding a mere pretense of a trial and rendered the conviction and sentence wholly void.") I respectfully concur.

A true Copy:

      Teste:

                         _____
                         *Clerk of the United States Court of*
                         *Appeals for the Seventh Circuit*